1    KIMBERLYN K. KING-HINDS    (F0495)
      LAW OFFICE OF KIMBERLYN K. KING-HINDS
2    P.O. Box 520064
      San Jose Village
3    Tinian, MP 96950
      Telephone No.: (670) 484-1117
4    Email: kkinghinds@gmail.com

5    Counsel for Plaintiffs

6

7                IN THE UNITED STATES DISTRICT COURT

8                FOR THE NORTHERN MARIANA ISLANDS

9

10    TINIAN WOMEN'S ASSOCIATION;      )    CIVIL NO.   16 - 00022
      GUARDIANS OF GANI; PAGANWATCH    )
11    and CENTER FOR BIOLOGICAL        )    COMPLAINT FOR DECLARATORY
      DIVERSITY,                        )    AND INJUNCTIVE RELIEF
12                                    )
                   Plaintiffs,          )
13                                    )
             vs.                       )
14                                    )
      UNITED STATES DEPARTMENT OF THE    )
15    NAVY; RAY MABUS, Secretary of the      )
      Navy; UNITED STATES DEPARTMENT     )
16    OF DEFENSE; and ASHTON CARTER,      )
      Secretary of Defense,                  )
17                                    )
             Defendants.         )
18    _____ )

19

20

21        Plaintiffs Tinian Women's Association, Guardians of Gani, PaganWatch and the Center for

22    Biological Diversity (collectively, "Plaintiffs") complain of defendants United States Department of the

23    Navy, Ray Mabus, in his official capacity as Secretary of the Navy, United States Department of

24    Defense, and Ashton Carter, in his official capacity as Secretary of the Department of Defense

25    (collectively, "Defendants") as follows:

FILED
Clerk
District Court

JUL 27 2016

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**INTRODUCTION**

1.     By this Complaint, Plaintiffs seek to compel Defendants to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., in connection with the Navy's decision to station permanently thousands of United States Marines on the island of Guam and to conduct live-fire training for those Marines on the islands of Tinian and Pagan in the Commonwealth of the Northern Mariana Islands ("CNMI").

2.     The Navy has acknowledged that construction and subsequent operation of proposed training facilities on Tinian and Pagan would kill native wildlife, including endangered Mariana fruit bats, and destroy native forests and coral reefs.

3.     Local communities would likewise suffer significant harm from the proposed training. Tinian's population would be subjected to, inter alia, high-decibel training noise, permanent loss of 15% of the island's prime farmland soils, destruction of cultural and historic sites, and severe restrictions on access to traditional fishing grounds, cultural sites and recreational beaches.  Families who formerly resided on Pagan would be forever banished from returning to their home island, which would be turned into a militarized wasteland.

4.     Under NEPA, the Navy was required – but failed – to evaluate in a single environmental impact statement ("EIS") the impacts of both permanent stationing of Marines on Guam and the training on Tinian and Pagan the Navy claims those Marines will need to perform their national security mission. In addition to segmenting illegally the environmental review of its Guam and CNMI Military Relocation project, the Navy further violated its NEPA duties when it refused to consider alternate locations outside the Mariana Islands where the Marines could accomplish their mission with fewer adverse impacts.

**JURISDICTION AND VENUE**

5.     The Court has subject matter jurisdiction over the claims for relief in this action pursuant to 5 U.S.C. §§ 701-706 (actions under the Administrative Procedure Act ("APA")); 28 U.S.C. § 1331

1 (actions arising under the laws of the United States); 28 U.S.C. § 1361 (actions to compel an officer of

2 the United States to perform his duty); and 28 U.S.C. §§ 2201-2202 (power to issue declaratory

3 judgments in cases of actual controversy).

4       6.     Venue lies properly in this judicial district by virtue of 28 U.S.C. § 1391(e) because this

5 is a civil action in which officers or employees of the United States or an agency thereof are acting in

6 their official capacity or under color of legal authority, a substantial part of the events or omissions

7 giving rise to the claims occurred in this judicial district, and plaintiffs Tinian Women's Association,

8 Guardians of Gani and PaganWatch reside here.

9

10                                  **PARTIES**

11 Plaintiffs

12       7.     Plaintiff Tinian Women's Association ("the Association") is a non-profit organization

13 based on Tinian and chartered in 1991 that is dedicated to addressing issues affecting Tinian's women

14 and children, including, but not limited to, the preservation of Chamorro culture, language, and ancestral

15 sites, as well as protection of Tinian's environment.  The Association's members include women, men

16 and children who live on Tinian and care deeply about these issues.

17       8.     The Association identifies itself as "the voices that care," and actively participates in

18 social, economic, and other development on Tinian. In furtherance of its mission, the Association drafts

19 laws, lobbies the Northern Marianas Commonwealth Legislature, holds conferences and forums on

20 topics of concern to Tinian residents, has initiated a study on the Chamorro language, advocates for

21 environmental protection, works to clean up and protect ancestral grounds, and promotes women's

22 rights and youth development.

23       9.     The military training the Navy now claims Guam-based Marines would need to conduct

24 on Tinian is antithetical to the Association's environmental, cultural, health, and economic interests,

25 would undo many of the accomplishments the Association has already achieved, and would severely

1   compromise the Association's ability to protect its interests in the future.  Accordingly, the Association

2   and its members have worked actively to oppose the proposed training on Tinian associated with the

3   Guam and CNMI Military Relocation project.  The Association has distributed flyers to educate its

4   members and the public at large regarding the anticipated impacts on Tinian of the proposed training and

5   provided assistance to Tinian residents who wished to submit comments during both scoping for the EIS

6   for CNMI Joint Military Training ("CJMT") – where the Navy first publicly identified the scope of the

7   training it now proposes to conduct on Tinian and Pagan as part of the Guam and CNMI Military

8   Relocation project – and the public comment period on the CJMT draft EIS.  The Association and its

9   members submitted comments both during the CJMT scoping process and on the CJMT draft EIS.

10          10.      The Association and its members are concerned that the proposed training on Tinian

11   would cause overwhelming damage that would effectively drive residents, including the Association's

12   members, out of Tinian.  More specifically, the Association and its members are concerned that the

13   proposed training would cause devastating noise, pollution and health risks, loss of native species, loss

14   of agricultural land, damage to the coral reef and other marine resources, loss of access to traditional

15   fishing areas and lost productivity of traditional fisheries, damage to and loss of access to cultural and

16   historical resources, harm to the tourism industry that is vital to the local economy and well-being of

17   Tinian residents, and restrictions on travel between Tinian and Saipan, Rota, and other CNMI islands, as

18   well as travel to Guam and the Philippines.

19          11.      Because Tinian has a medical clinic but no hospital, the Association and its members are

20   concerned that travel restrictions associated with the proposed training would interfere with ability of

21   Tinian residents - including, but not limited to, the Association's members - to get advanced healthcare

22   on Saipan, on Guam or in the Philippines in a timely manner.  Travel restrictions associated with the

23   proposed training would also isolate families from each other and inhibit the practice of family

24   gatherings for important occasions such as weddings or christenings, as many families are dispersed

25

4

1   over several islands and travel frequently between islands to visit each other and perpetuate their culture

2   and language.

3      12.     As residents of Tinian, the Association's members regularly use and plan to continue to

4   use the land, waters, infrastructure and economy on Tinian to live, and to educate their children about

5   their culture and ensure its continued existence.  The Association and its members are concerned that, if

6   the proposed military training on Tinian were to occur, the Association's members would no longer be

7   able to live productive or healthy lives there, and will also lose important elements of their culture.  To

8   protect its organizational interests and the interests of its members in improving the lives of Tinian

9   women and children through, among other things, protecting the environment and embracing their

10  culture, the Association brings this action on behalf of itself and its adversely affected members.

11     13.     Plaintiff Guardians of Gani ("the Guardians") is a non-profit grassroots organization

12  based on Saipan and founded in 2013 that is dedicated to protecting "Gani," which refers to the Mariana

13  Islands to the north of Saipan, including Pagan, and the heritage of the indigenous people of Gani,

14  including, but not limited to, safeguarding and reclaiming the birthright of indigenous people to access

15  and to resettle Gani.  The Guardians' membership consists of residents of the Northern Mariana Islands,

16  including, but not limited to, members who are of Chamorro and Carolinian heritage.

17     14.     Recognizing that the environmental health of their islands, the health of their people, and

18  the survival of their culture are inextricably linked, the Guardians and its members work to promote

19  stewardship, conservation, and preservation efforts for Gani.  The Guardians advance their mission by

20  discussing relevant issues, especially the U.S. military's activities in the CNMI, on a local radio show.

21  Additionally, the Guardians and its members attend public meetings to contribute their perspectives on

22  relevant issues, lobby for their interests at the Northern Marianas Commonwealth Legislature, author

23  articles for the local newspaper, and make presentations at local schools.  The Guardians and its

24  members also work with the local government to reestablish the homestead program, which would

25  further efforts to promote resettlement of Gani by providing housing and infrastructure there.

15.     For years, the Guardians and its members have advocated for the preservation and resettlement of Gani and have worked towards a future in Gani that allows a return to a more traditional, productive, and fulfilling lifestyle.  The proposed training of Guam-based Marines on Pagan poses an existential threat to the survival of the environment and culture on Pagan and plans to settle there. Accordingly, the Guardians and its members have focused their efforts on opposing any such military activities.

16.     The Guardians and its members are concerned that training on Pagan associated with the Guam and CNMI Relocation would effectively eliminate opportunities to resettle Pagan and would severely restrict travel to Pagan, preventing the indigenous peoples of Pagan from exercising their birthright to access their home island.  The proposed training on Pagan would turn the island into a war zone, with surface danger zones established for live-fire training blanketing nearly the entire island and cutting off access by sea or air for much of the year.  Even if resettlement were permitted in the small area in the south of Pagan outside the surface danger zone, life there would be intolerable, with deafening noise from live-fire training, insufficient arable land and restricted access to fisheries whose resources would be depleted by the proposed training.

17.     The Guardians and their members are further concerned that the proposed war games on Pagan would preclude the establishment of a robust ecotourism industry, which is central to the Guardians' plans to provide a stable economic base for resettlement.  In addition to preventing tourists from accessing Pagan, the proposed training would result in destruction of the historical, cultural and natural resources, both terrestrial and marine, that are necessary to draw tourists to Pagan.

18.     The Guardians and its members are deeply concerned about the health impacts of the proposed training on Pagan.  The people of the CNMI already experience high cancer rates, which the Guardians attribute to leached chemicals and other contamination associated with U.S. military activities during World War II.  The Guardians and its members believe these health impacts would be worsened by the proposed military training on Pagan.

19.     The Guardians and its members are further concerned that existing historical and cultural sites on Pagan, as well as those historical artifacts and cultural information that have yet to be discovered and researched, would be destroyed and lost forever if the proposed training on Pagan were to proceed.

20.     The Guardians' members travel to Pagan regularly, with the next trip to Pagan planned for August 2016, and intend to continue to do so.  Members of the Guardians also have plans to resettle Pagan.

21.     The Guardians and their members view Gani as the last frontier to revive their traditions and culture.  The proposed training associated with the Guam and CNMI Military Relocation would render Pagan unlivable and inaccessible, adversely affecting the interests of the Guardians and its members.  The Guardians bring this action on behalf of itself and its adversely affected members.

22.     Plaintiff PaganWatch is an unincorporated association based on Saipan and founded in 2004 that is dedicated to advocating for the rights of residents of Gani, including Pagan.  PaganWatch's membership includes, but is not limited to, individuals of Chamorro and Carolinian descent who are current or past residents of Pagan.  Some PaganWatch members currently live on Pagan, while others want to return to live as their ancestors did:  to farm, fish, work, engage in cultural practices, and pass on such traditions and way of life to their children to preserve their culture and heritage.

23.     PaganWatch's mission is to protect Gani and its people by advocating for the rights of the current and former residents of those islands, especially their right to resettle there, and to protect the rights and interests of the people of Northern Marianas descent in the CNMI's public land, including Pagan.  Initially, PaganWatch was created to oppose the pozzolan mining that was proposed for Pagan, which would have eliminated the current and former residents' access to and ability to resettle on Pagan.  PaganWatch's opposition and advocacy work resulted in the restructuring of public land management in the CNMI and has helped to foster a settlement plan and development plan for the residents of Gani.

24.     In response to the proposed military training on Pagan associated with the Guam and CNMI Military Relocation project, PaganWatch has continued to advocate for residents' right of access to public land, and to work to reestablish their right to resettle on the islands of Gani, including Pagan. PaganWatch has promoted those rights and interests through outreach in local media, by authoring articles, posting online updates about military activities and plans in the CNMI, hosting meetings for PaganWatch's members, and lobbying and working with local government.

25.     In 2015, PaganWatch submitted comments on the CJMT draft EIS.  Among other things, PaganWatch pointed out the Navy's failure to comply with NEPA's mandate to consider in a single EIS the environmental impacts of both the training proposed for Pagan and the relocation of Marines to Guam that the Navy claims necessitates this training.

26.     PaganWatch members have cultural, social, economic, health and aesthetic interests in the preservation of Pagan, and in settling there.  They are concerned that the military training the Navy now claims Guam-based Marines would need to conduct on Pagan will prevent the resettlement of Pagan, restrict access to fishing areas and travel, destroy cultural resources, exacerbate existing health issues caused by previous military activity in the area, destroy the economy by eliminating natural, cultural and historical resources that sustain the tourism industry, and severely damage the environment.

27.     The training on Pagan associated with the Guam and CNMI Military Relocation project would adversely affect PaganWatch's and its members' interests by destroying Pagan's natural, historical and cultural resources, cutting off access to the island and effectively preventing resettlement. The proposed training would adversely affect PaganWatch's members' ability to maintain their own health, economic, and cultural wellbeing and would impede their ability to provide a better life for future generations.  PaganWatch brings this action on behalf of itself and its adversely affected members.

28.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit conservation organization with more than 45,000 members, including members who reside in the Mariana Islands, dedicated to the preservation, protection, and restoration of biodiversity and ecosystems throughout the

world.  The Center works to insure the long-term health and viability of animal and plant species, and to protect the habitat these species need to survive and recover.  The Center is actively involved in species and habitat protection issues throughout the United States and the world, including working to protect plant and animal species from habitat destruction and harmful activities.

29.     The Center has worked to protect the wildlife of Guam and the CNMI since at least 2000, including through the filing of petitions to the United States Fish and Wildlife Service ("the Service") to designate species as threatened or endangered, and to designate critical habitat for listed species, pursuant to the Endangered Species Act.  These petitions include the Center's December 2013 petition to list the Tinian monarch as a threatened or endangered species, which is currently pending before the Service.

30.     In April 2000, the Center filed suit against the Service, challenging its failure to designate critical habitat for several endangered species from Guam and the CNMI, including species that would be harmed by the Guam and CNMI Military Relocation proposal.  In April 2002, the court entered a settlement agreement requiring the Service to finalize new rules regarding critical habitat for these species, which were published in the Federal Register in October 2004.

31.     In December 2000, the Center filed suit against the Navy to halt the killing of migratory birds as result of live-fire training exercises on Farallon de Medinilla in the CNMI.  In March 2002, the court held that the Navy violated the Migratory Bird Treaty Act by killing birds without a permit through its live-fire training exercises.

32.     In February and August of 2010, the Center submitted comments on the EIS the Navy prepared for its Guam and CNMI Military Relocation proposal.  In December 2013, the Center submitted comments on the draft EIS for proposed Mariana Islands Training and Testing Activities.  In July 2015, the Center submitted comments on the draft CJMT EIS.

33.     The Center brings this action on its own behalf and on behalf of its members, including members who use and enjoy specific areas and public lands on the islands of Guam, Tinian and Pagan

1  for a number of activities including, but not limited to, hiking, biking, bird watching and photographing

2  scenery and wildlife.  The Center and its members derive recreational, spiritual, scientific, educational,

3  and aesthetic benefits from their use and enjoyment of these activities on Guam, Tinian and Pagan.  The

4  Center and its members intend to continue to use and enjoy specific areas and public lands on Guam,

5  Tinian and Pagan in the future, including this year.

6       34.     The aforementioned cultural, social, economic, recreational, spiritual, scientific,

7  educational, aesthetic and other interests of Plaintiffs and their members on Guam, Tinian and Pagan

8  will be adversely affected and irreparably injured by the proposed major expansion of the United States

9  military's presence and training activities on these islands through the Guam and CNMI Military

10  Relocation project.  Plaintiffs' and their members' injuries are the result of the Navy's failure to comply

11  with NEPA prior to authorizing this major expansion.  These are actual, concrete injuries caused by the

12  Navy's failure to comply with mandatory duties and procedures under federal law.  The injuries would

13  be redressed by the relief sought.

14

15  Defendants

16       35.     Defendant United States Department of the Navy is an agency of the United States

17  Department of Defense.  The Navy is responsible for complying with NEPA prior to making decisions

18  regarding the stationing of Marines on Guam and training activities on Tinian and Pagan.

19       36.     Defendant Ray Mabus is sued in his official capacity as Secretary of the Navy and is the

20  highest-ranking official within the United States Department of the Navy.

21       37.     Defendant United States Department of Defense is the federal agency with ultimate

22  responsibility for implementing and enforcing compliance with provisions of law that have been

23  violated as alleged in this Complaint.

24       38.     Defendant Ashton Carter is sued in his official capacity as the Secretary of the

25  Department of Defense.

## STATUTORY AND REGULATORY BACKGROUND

Obligation To Prepare Environmental Impact Statements

39.     The National Environmental Policy Act of 1969 is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  NEPA procedures seek to "insure that environmental information is available to public officials and citizens <u>before</u> decisions are made and <u>before</u> actions are taken," so that federal agencies can incorporate the wisdom gained into the action.  <u>Id.</u> § 1500.1(b) (emphasis added).  "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." <u>Id.</u> § 1500.1(c).

40.     The Council on Environmental Quality ("CEQ") has promulgated rules implementing NEPA, which apply to all federal agencies, including the Navy.  <u>See id.</u> pt. 1500.

41.     To accomplish its purposes, NEPA requires federal agencies to prepare an environmental impact statement for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  "Major federal actions" subject to NEPA include both "new and continuing activities" with "effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.  The "human environment" includes "the natural and physical environment and the relationship of people with that environment." <u>Id.</u> § 1508.14.

42.     "The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government." <u>Id.</u> § 1502.1.  An EIS must "provide full and fair discussion of significant environmental impacts and [must] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." <u>Id.</u>

\\

\\

Public Involvement In Environmental Impact Statement Process

43.   Preparing an EIS provides important opportunities for public involvement in federal agency decision-making, and NEPA commands federal agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." Id. § 1506.6(a).

44.   After publishing in the Federal Register a Notice of Intent to prepare an EIS, an agency normally must invite the public to participate in "scoping," which is "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." Id. § 1501.7.

45.   The agency then prepares a draft EIS in accordance with the scope decided on in the public scoping process and circulates the draft EIS for public review.  Id. §§ 1502.9(a), 1502.19.  The agency must seek public comments on the draft EIS, "affirmatively soliciting comments from those persons or organizations who may be interested or affected." Id. § 1503.1(a)(4).

46.   The agency must "assess and consider comments [on the draft EIS] both individually and collectively" and respond to these comments in the final EIS.  Id. § 1503.4(a); see also id. § 1502.9(b). "Possible responses are to":

(1)   Modify alternatives including the proposed action.

(2)   Develop and evaluate alternatives not previously given serious consideration by the agency.

(3)   Supplement, improve, or modify its analysis.

(4)   Make factual corrections.

(5)   Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position ... .

Id. § 1503.4(a).

47.   The agency must file the final EIS with the Environmental Protection Agency ("EPA"), which then publishes in the Federal Register a notice of filing.  Id. §§ 1506.9, 1506.10(a).  The agency

12

1  must wait at least thirty days after publication of this notice before making a decision on the proposed

2  action.  Id. § 1506.10(b)(2).

3

4  Required Scope Of Environmental Impact Statements

5        48.     An EIS must discuss, among other things:  the environmental impact of the proposed

6  federal action, any adverse and unavoidable environmental effects, any alternatives to the proposed

7  action, and any irreversible and irretrievable commitment of resources involved in the proposed action.

8  42 U.S.C. § 4332(2)(C).

9        49.     NEPA requires connected and cumulative actions to be considered together in a single

10  EIS.  40 C.F.R. § 1508.25(a)(1), (2).

11       50.     The CEQ regulations define "[c]onnected actions" as actions that:

12       (i)     Automatically trigger other actions which may require environmental impact
                 statements.
13
         (ii)    Cannot or will not proceed unless other actions are taken previously or
14               simultaneously.

15       (iii)   Are interdependent parts of a larger action and depend on the larger action for
                 their justification.
16

17  Id. § 1508.25(a)(1); see also id. § 1502.4(a) ("Proposals or parts of proposals which are related to each

18  other closely enough to be, in effect, a single course of action shall be evaluated in a single impact

19  statement").

20       51.     "Cumulative actions" are those "which when viewed with other proposed actions have

21  cumulatively significant impacts and should therefore be discussed in the same impact statement."  Id. §

22  1508.25(a)(2); see also id. § 1508.7 ("'Cumulative impact' is the impact on the environment which

23  results from the incremental impact of the action when added to other past, present, and reasonably

24  foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such

25  other actions").

13

1    52.    The alternatives section "is the heart of the environmental impact statement." Id. §

2  1502.14.  In this section, agencies must "[r]igorously explore and objectively evaluate all reasonable

3  alternatives," devoting "substantial treatment to each alternative considered in detail . . . so that

4  reviewers may evaluate their comparative merits." Id. § 1502.14 (a), (b); see also id. § 1508.25(b).  The

5  core purpose of the alternatives analysis is to "sharply defin[e] the issues and provid[e] a clear basis for

6  choice among options by the decisionmaker and the public." Id. § 1502.14.

7    53.    Compliance with NEPA's requirement for federal agencies to consider a range of

8  alternate courses of action is necessary to achieve Congress' declared purpose to "encourage productive

9  and enjoyable harmony between man and his environment" and "to promote efforts which will prevent

10  or eliminate damage to the environment."  42 U.S.C. § 4321.

11

12  Duty To Supplement NEPA Analysis

13    54.    Federal agencies, including the Navy, are obliged to "prepare supplements to either draft

14  or final environmental impact statements if:"

15    (i)    The agency makes substantial changes in the proposed action that are relevant to
        environmental concerns; or
16
17    (ii)   There are significant new circumstances or information relevant to environmental
        concerns and bearing on the proposed action or its impacts.

18  40 C.F.R. § 1502.9(c)(1).

19    55.    Federal agencies generally must "prepare, circulate, and file a supplement to a statement

20  in the same fashion … as a draft and final statement." Id. § 1502.9(c)(4).

21

22                    **FACTUAL BACKGROUND**

23    56.    There are currently no Marines permanently stationed on Guam or in the CNMI.  The

24  only training by Marines that currently takes place in the Marianas occurs on a transient basis.

25

                                        14

57.     On Tinian, the only live-fire training transient Marines currently conduct occurs at a sniper training range where small arms are fired into bullet traps.

58.     Plaintiffs are informed and believe, and on the basis thereof allege, that no military training currently takes place on Pagan.

The 2010 Final Environmental Impact Statement And Record of Decision

59.     In July 2010, the Navy issued a final EIS to evaluate the relocation of approximately 8,600 Marines from Okinawa to Guam ("FEIS").  The relocation was proposed to implement an agreement the United States and Japan reached in 2006 to reduce the number of Marines permanently stationed on Okinawa.

60.     Despite numerous public comments urging the Navy to examine alternate locations for the stationing of Marines relocated from Okinawa, the Navy refused to do so.  In its FEIS, the Navy claimed that Guam was the only location for the realignment of these forces that could satisfy the United States' national security needs and treaty obligations.

61.     The FEIS acknowledged that "[t]he need for Marine training and operations is closely dependent on the relocation.  Marines can only be 'readily and rapidly deployable' if they are able to meet training and readiness requirements."

62.     The FEIS purported to analyze the facilities and operational and training requirements of the Marine Corps units relocating to Guam, including the impacts of the construction and operation of all live-fire ranges needed to provide required training.  The FEIS concluded that Guam could not accommodate all required live-fire training ranges, and, accordingly, the Navy looked outside Guam for locations to build and operate live-fire ranges.

63.     Despite numerous public comments urging the Navy to analyze locations outside the Mariana Islands to build and operate live-fire ranges for the relocated Marines, the Navy refused to do so.  The Navy claimed in the FEIS that live-fire training for the relocated Marines that could not be

1   accommodated on Guam must take place in the CNMI and further asserted that the island of Tinian was

2   "the only suitable location for this training for Marines based on Guam." The FEIS expressly rejected

3   consideration of the island of Pagan as a training location.

4         64.   The FEIS stated that the relocated Marines would need the following live-fire ranges on

5   Tinian: a Rifle Known Distance Range, an Automated Combat Pistol/Military Police Firearms

6   Qualification Course, a Platoon Battle Course, and a Field Firing Range. The FEIS specified that the

7   weapons to be employed on these ranges would be limited to pistols, rifles and squad automatic

8   weapons firing bullets. The FEIS noted that proposed training would not use heavy machine guns,

9   mortars, artillery, rockets or missiles.

10         65.   The EPA published the Notice of Availability for the FEIS in the Federal Register on

11   July 28, 2010.

12         66.   On September 20, 2010, the Navy issued its record of decision based on the FEIS ("2010

13   ROD"). In the 2010 ROD, the Navy decided to relocate the approximately 8,600 Marines from

14   Okinawa to Guam and to build and operate the live-fire ranges on Tinian described in the FEIS.

15

16   Developments Following Issuance Of The 2010 ROD

17         67.   In 2012, the United States and Japan modified their 2006 agreement on reducing the

18   number of Marines stationed on Okinawa. Under the revised agreement, approximately 9,000 Marines

19   would leave Okinawa, but only approximately 5,000 would be relocated to Guam. The remaining

20   Marines would be relocated to Hawai'i, and, on a rotational basis, to Australia.

21         68.   After the 2010 ROD's issuance, the Navy reassessed the live-fire training required for

22   Marines to be relocated to Guam to carry out their mission, concluding that the live-fire training

23   analyzed in the FEIS and selected in the 2010 ROD would not be adequate. Instead, the Navy

24   concluded that substantially more intense and destructive live-fire training was necessary, requiring the

25   use of artillery, mortars, rockets, amphibious assaults, attack helicopters and warplanes, and ship-to-

1  shore naval bombardment. The Navy further concluded that this ramped-up training could not be

2  conducted on Tinian alone, but rather that live-fire ranges would have to be constructed and operated on

3  both Tinian and Pagan.

4      69.    The live-fire training on Tinian that the Navy now deems necessary for Marines to be

5  stationed on Guam includes, but is not limited to, a High Hazard Impact Area where high explosives

6  from ground-based and aviation training activities would be employed. Ground-based activities would

7  include the use of hand grenades, 60- and 81-millimeter mortars, and rockets. Aviation activities would

8  use live munitions from machine guns and rockets and delivery of inert aviation ordnance. Additionally,

9  artillery – including, but not limited to, over 13,500 155-millimeter, high explosive rounds per year –

10  would be fired at the High Hazard Impact Area.

11     70.    To train Guam-based Marines adequately, the Navy also now believes it necessary to

12  construct and operate on Tinian an Anti-Armor Tracking Range, a Tank/Fighting Vehicle Stationary

13  Target Range, a Multi-Purpose Training Range, a Tank/Fighting Vehicle Multi-Purpose Range

14  Complex, an Infantry Platoon Battle Course and an Urban Assault Course. Live-fire training at these

15  ranges would include the use of rifles and machine guns, as well as grenade and rocket launchers.

16     71.    The Navy has further concluded that Guam-based Marines would need to conduct non-

17  live-fire Tactical Amphibious Landing Beach training at four beaches on Tinian: (1) Unai Babui, (2)

18  Unai Chulu, (3) Unai Lam Lam and (4) Unai Masalok.

19     72.    On Pagan, which the 2010 FEIS concluded was neither needed nor suitable for training

20  Marines to be stationed on Guam, the Navy now contends it must establish a High Hazard Impact Area

21  centered on Mount Pagan to support ground-based, air-to-ground and ship-to-shore live-fire training.

22  Ground-based training would include a Field Artillery Indirect Fire Range, a Field Artillery Direct Fire

23  Range and a Mortar Range, where Marines would employ 120- and 155-millimeter artillery rounds and

24  60- and 80-millimeter mortar rounds. Air-to-ground training would include an Offensive Air Support

25  Range, a Close Air Support Range, an Anti-Air Warfare Range and Combined Arms Training to

17

1   Support Close Air Support and Naval Gunfire Support Training.  Air-delivered munitions would include

2   bombs of up to 2,000 pounds and air-launched rockets.  Ship-to-shore naval gunfire training would

3   pound the island with 5-inch high explosive rounds.

4         73.     The Navy further claims that Marines stationed on Guam would need to conduct live-fire

5   tactical amphibious training on up to six beaches on Pagan (Red, Green, Blue, Gold, North and South).

6

7   The 2015 Supplemental Environmental Impact Statement And Record Of Decision

8         74.     The Navy concluded that the substantial reduction in the number of Marines to be

9   relocated to Guam from 8,600 to 5,000 would affect aspects of the actions analyzed in the FEIS and

10   approved in the 2010 ROD, such as the size and location of the cantonment and family housing areas on

11   Guam.  Accordingly, the Navy prepared a supplemental EIS to evaluate those changed circumstances

12   ("SEIS").  The SEIS also evaluated alternate locations for the development of a live-fire training range

13   complex on Guam, a decision the Navy had deferred in 2010.

14         75.     The EPA published the Notice of Availability for the SEIS in the Federal Register on

15   July 17, 2015.

16         76.     Despite the Navy's finding that the live-fire training on Tinian evaluated in the FEIS and

17   selected in the 2010 ROD would not permit Guam-based Marines to perform their mission, the Navy

18   rejected public comments calling for evaluation in the SEIS of the impacts of the live-fire training on

19   Tinian and Pagan that the Navy now deems necessary.  Instead, the Navy stated it would analyze the

20   impacts of the relocated Marines' live-fire training on Tinian and Pagan in an entirely separate EIS – the

21   CJMT EIS – a draft of which was issued in April 2015.

22         77.     The SEIS states that any "decision regarding proposed training ranges as evaluated in the

23   CJMT EIS would supersede the 2010 ROD with regards to Tinian range projects."  Moreover, in the

24   SEIS, the Navy announced it "has deferred any implementation of the Tinian training ranges from the

25   2010 ROD pending the outcome of the CJMT EIS."

1    78.    The Navy also failed to consider in its SEIS any alternate locations outside the Mariana

2  Islands for stationing and/or training Marines relocated from Okinawa, even though the 2012 agreement

3  between the United States and Japan acknowledges that Marines do not need to be stationed and trained

4  in the Marianas to satisfy the United States' national security needs and treaty obligations.

5    79.    On August 28, 2015, the Navy issued its record of decision based on the SEIS ("2015

6  ROD"). The 2015 ROD reaffirmed the Navy's 2010 decision to relocate Marines from Okinawa to the

7  Mariana Islands, despite the lack of any final NEPA analysis of the live-fire training on Tinian and

8  Pagan the Navy deems necessary for those Marines to conduct their mission or any consideration of

9  stationing and/or training locations outside the Mariana Islands.

10    80.    On February 16, 2016, the Navy announced its plan to issue a revised draft CJMT EIS.

11  The Navy stated it does not expect to release the revised draft CJMT EIS until March 2017. The Navy

12  further stated it does not expect to issue a record of decision for CJMT until sometime in 2018.

13

14                                      **FIRST CLAIM FOR RELIEF**

15      (VIOLATIONS OF NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE
       PROCEDURE ACT – FAILURE TO CONSIDER RELOCATION TO GUAM AND ASSOCIATED

16         LIVE-FIRE TRAINING IN A SINGLE ENVIRONMENTAL IMPACT STATEMENT)

17    81.    Plaintiffs reallege and incorporate herein by reference each and every allegation

18  contained in all preceding paragraphs of this Complaint.

19    82.    Defendants' relocation of thousands of Marines to Guam and the construction and

20  operation of live-fire ranges on Tinian and Pagan are "connected actions" under 40 C.F.R. §

21  1508.25(a)(1) because, without adequate training, the Marines cannot perform their national security

22  mission or fulfill the United States' treaty obligations. Accordingly, the relocation of Marines to Guam

23  automatically triggers the need to conduct training required for military readiness, as well as the

24  construction of training ranges if such ranges do not already exist, actions which not only may, but do,

25  require an EIS. Moreover, the Navy is proposing the construction and operation of new live-fire ranges

1   on Tinian and Pagan specifically to train relocated Marines.  Plaintiffs are informed and believe, and on

2   the basis thereof allege, that the actions on Tinian and Pagan would not proceed unless the relocation to

3   Guam took place previously or simultaneously.  Finally, stationing and training of the relocated Marines

4   are both parts of a larger action – satisfying the United States' national security needs and treaty

5   obligations – and depend on that larger action for their justification.

6       83.     Defendants' failure to evaluate the aforementioned "connected actions" in a single EIS

7   violates NEPA.  See 40 C.F.R. § 1508.25(a)(1).

8       84.     Alternatively, Defendants violated NEPA by failing to consider within a single EIS the

9   overall cumulative impacts of relocating Marines to Guam and the live-fire range construction and

10  operations on Tinian and Pagan the Navy has concluded are necessary to train Guam-based Marines to

11  carry out their mission.  See 40 C.F.R. § 1508.25(a)(2).

12      85.     The Navy's reliance on the legally deficient FEIS and SEIS to issue its records of

13  decision to proceed with the relocation of Marines from Okinawa to the Mariana Islands was arbitrary,

14  capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure

15  required by law within the meaning of the APA, 5 U.S.C. § 706(2).

16

17                          **SECOND CLAIM FOR RELIEF**

18          (VIOLATIONS OF NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE
                     PROCEDURE ACT – FAILURE TO CONSIDER ALTERNATIVES)

19

20      86.     Plaintiffs reallege and incorporate herein by reference each and every allegation

21  contained in all preceding paragraphs of this Complaint.

22      87.     NEPA requires that an EIS analyze reasonable alternatives to a proposed action.  See 40

23  C.F.R. § 1502.14.  Despite being urged to do so by members of the public, including Plaintiffs, the Navy

24  refused to give detailed consideration in its FEIS or SEIS to any alternate locations outside the Mariana

25

                                          20

1    Islands for stationing and/or training Marines relocated from Okinawa.  The FEIS's and SEIS's deficient

2    alternatives analyses violate NEPA.

3         88.    The Navy's reliance on the legally deficient FEIS and SEIS to issue its records of

4    decision to proceed with the relocation of Marines from Okinawa to the Mariana Islands was arbitrary,

5    capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure

6    required by law within the meaning of the APA, 5 U.S.C. § 706(2).

7

8                              **PRAYER FOR RELIEF**

9         WHEREFORE, Plaintiffs respectfully request that the Court:

10        1.    Enter a declaratory judgment that Defendants have violated and are violating the National

11   Environmental Policy Act and Administrative Procedure Act by adopting and relying on the legally

12   deficient FEIS and SEIS to issue records of decision regarding the relocation of Marines from Okinawa

13   to the Mariana Islands.

14        2.    Vacate and set aside the 2010 and 2015 Records of Decision regarding the relocation of

15   Marines from Okinawa to the Mariana Islands.

16        3.    Issue any appropriate injunctive relief.

17        4.    Award Plaintiffs the costs of this litigation, including reasonable attorney's fees; and

18        5.    Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

19

20        DATED:  July 27, 2016 at Saipan, CNMI.

21                                   LAW OFFICE OF
                                     KIMBERLYN K. KING-HINDS
22                                   P.O. Box 520064
                                     San Jose Village
23                                   Tinian, MP  96950

24

25                              By:  KIMBERLYN K. KING-HINDS
                                     Counsel for Plaintiffs

                                     21