F I L E D
Clerk
District Court

OCT 13 2017

for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| TINIAN WOMEN ASSOCIATION, GUARDIANS OF GANI, PAGANWATCH, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>   Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, RICHARD SPENCER, Secretary of the Navy, UNITED STATES DEPARTMENT OF DEFENSE, and JAMES MATTIS, Secretary of Defense,[1]<br><br>   Defendants. | Case No.: 16-cv-00022<br><br><br>**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS COMPLAINT** |

## I.  INTRODUCTION

  This case involves plaintiffs' challenge to a large-scale effort by the U.S. Department of the Navy and Department of Defense to relocate several thousand U.S. Marines from Okinawa to Guam. Plaintiffs maintain that this effort may not proceed until defendants comply with the statutory obligations imposed by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Court *sua sponte* amends the case caption to reflect that Richard Spencer is currently the Secretary of the Navy and James Mattis is currently the Secretary of Defense.

1

Currently before the Court is defendants' motion to dismiss the complaint for lack of jurisdiction. (ECF No. 19.) The motion has been fully briefed,[2] and oral argument was heard on February 9, 2017.

For the reasons set forth below, defendants' motion is granted in part and denied in part.

## II. BACKGROUND

The background provided below draws from the allegations and exhibits submitted by the parties, and the parties do not dispute the chronology of events that led to this lawsuit.

On October 29, 2005, the United States and Japan issued a document entitled "U.S.-Japan Alliance: Transformation and Realignment for the Future," which set forth their strategic objectives and plans to "adapt the alliance to the changing regional and global security environment." (Ex. 4, U.S.-Japan Alliance Doc., ECF. No. 20-4.) The objectives included expanding "training of [Japan Self-Defense Forces] and units in Guam, Alaska, Hawaii, and the U.S. mainland," and redistributing Marine Corps "among Hawaii, Guam, and Okinawa," such as by relocating the headquarters of the III Marine Expeditionary Force to Guam and transferring "approximately 7,000 Marine officers and enlisted personnel, plus dependents out of Okinawa." (*Id.* at 7, 11, 13.)

To finalize the initiatives and objectives set forth in the October 29, 2005 document, the United States and Japan issued the "United States-Japan Roadmap for Realignment Implementation" on May 1, 2006. (Ex. 1, U.S.-Japan Roadmap, ECF No. 20-1.) As part of a "coherent package," the realignment initiatives included relocation of approximately 8,600 III Marine Expeditionary Force

---

[2] Motion to Dismiss and Memorandum in Support with Exs. 1-8 ("Motion") (ECF Nos. 19, 20, 20-1, 20-2, 20-3, 20-4, 20-5, 20-6, 20-7, 20-8); Opposition to Motion (ECF No. 21); Plaintiffs' Request for Judicial Notice of Exhibits A-O (ECF No. 22); Reply Brief (ECF No. 27); Defendants' Supplemental Memorandum (ECF No. 38); and Plaintiffs' Supplemental Memorandum (ECF No. 39). Page references are from the CM/ECF page numbers.

("III MEF") personnel and their dependents from Okinawa to Guam, with Japan agreeing to provide $6.09 billion, including $2.8 billion in cash contributions, "to develop facilities and infrastructure on Guam to enable the III MEF relocation," and the United States providing the remaining funds. (*Id.* at 2–4.) The Roadmap further clarified that "the Okinawa-related realignment initiatives are interconnected," with the III MEF relocation dependent on "tangible progress toward completion of the [Futenma Replacement Facility ("FRF")]," and "Japan's financial contributions." (*Id.* at 5.)

After the United States and Japan agreed on these commitments, beginning in 2007 the U.S. Department of the Navy prepared a draft environmental impact statement ("EIS") on the impact of relocating 8,600 Marines and their dependents from Okinawa to Guam in a document titled, "Guam and CNMI Military Relocation, Relocating Marines from Okinawa, Visiting Carrier Berthing, and Army Air and Missile Defense Task Force" ("Guam and CNMI Relocation and Training EIS"). (Motion 18; Whelden Decl. ¶ 3, ECF No. 20-7.)

Approximately two years later, the United States and Japan formally memorialized these commitments in the February 17, 2009 "Agreement between the Government of the United States of America and the Government of Japan Concerning the Implementation of the Relocation of III Marine Expeditionary Force Personnel and their Dependents from Okinawa to Guam," which would legally bind the parties once it entered into force. (Ex. 2, 2009 Agreement, ECF No. 20-2.)

Following this agreement, the Department of the Navy released a final EIS, which assessed the impacts of relocating 8,600 Marines and their dependents from Okinawa to Guam. (Ex. F, 2010 Final EIS, Vol. 2 at 2; ECF No. 22-6.) The components of the relocation included "Main Cantonment, Training-Firing Range, Training-Ammunition Storage, and Training-NMS Access Road, Airfield and

Waterfront." (*Id*. at 4.) Several alternative sites were assessed for each component except the airfield and waterfront. (*Id*.) The final EIS also assessed "the proposed development of live-fire training ranges to support training and operations that would occur on Tinian in the CNMI associated with the Marine Corps relocation to Guam." (Ex. C, 2010 Final EIS, Vol. 1, ECF No. 22-3.) In describing the scope of the EIS, the Navy wrote, "The proposed federal actions are subject to NEPA." (*Id*. at 3.) The Navy also concluded, "The U.S.-Japan (1960) treaty . . . is the most relevant to the proposed action" and "contains general provisions on the further development of international cooperation and on improved future economic cooperation," as well as obligations related to defense. (Ex. F, 2010 Final EIS, Vol. 2 at 3, ECF No. 22-6.)

Based on the final EIS, the Navy issued a Record of Decision ("ROD"), in which the agencies announced their "decision to proceed with Guam and Commonwealth of Northern Mariana Islands (CNMI) Military Relocation," and "decided to select all of the preferred alternatives described in Volumes 2, 3, and 6 of the FEIS and to implement all mitigation measures noted in this ROD." (Ex. D, 2010 R. of Decision 2, 5, ECF No. 22-4.) This included the decision to construct several live-fire training ranges on Tinian. (*Id*. at 6.) However, the Navy and Marine Corps deferred decision on several live-fire training sites on Guam. (*Id*. at 5–6.)

In February 2012, the Departments of the Navy and Defense issued a Notice of Intent to prepare a supplemental EIS to "evaluate the potential environmental consequences that may result from construction and operation of a live-fire training range complex and associated infrastructure on Guam." (Ex. E, Notice of Intent to Prepare Supplemental EIS 1, ECF No. 22-5.) Specifically, the scope of the supplemental EIS included five alternative sites for the live-fire training range complex

on Guam, which the Navy had identified after deferring decision on a site for the training range in the 2010 Record of Decision.  (*Id.* at 1–2.)

In April 2012, as the result of ongoing negotiations to implement the 2009 Agreement, the United States and Japan announced that they had agreed to "delink the relocation of the III Marine Expeditionary Force (MEF) personnel from Okinawa to Guam . . . from progress on the Futenma Replacement Facility" due to "the increasingly uncertain security environment in the Asia-Pacific region" and to "achieve the goals of the shared partnership."  (Ex. 5, 2012 Jt. Stmt. 2, ECF No. 20-5.) The Governments agreed that "a total of approximately 9,000 Marines, along with their associated dependents, are to be relocated from Okinawa to locations outside of Japan," and the "authorized strength of U.S. Marine Corps forces in Guam is to be approximately 5,000 personnel."  (*Id.* at 3.) "[T]o expedite the establishment of an operational U.S. Marine Corps presence in Guam, . . . the two governments reaffirmed that Japan's financial commitment is to be the direct cash contribution as stipulated in Article 1 of the 2009 Guam International Agreement."  (*Id.* at 4.)  Further, "to develop Guam as a strategic hub and mitigate the impact of the U.S. military presence on local communities, both governments plan to explore new efforts to promote bilateral dynamic defense cooperation," including "cooperation in developing training areas in Guam and the Commonwealth of the Northern Mariana Islands as shared-use facilities by U.S. forces and the JSDF."  (*Id.*)

On October 11, 2012, the Department of the Navy issued a Notice of Intent to expand the scope of the ongoing supplemental EIS to reflect the April 2012 changes to the U.S.-Japan Agreement, stating that the adjustments included relocation of 5,000 Marines and their dependents instead of 8,600 Marines.  (Ex. G, Notice of Intent to Prepare Supplemental EIS 1–2, ECF No. 22-7.)  The expanded

scope did not include the "relocation of the Marine Corps Aviation Combat Element facilities to [Anderson Air Force Base ("AAFB")], the development of the Northern Gate and access road at AAFB, the establishment of training ranges on Tinian, Apra Harbor wharf improvements, and the non-live-fire training ranges." (*Id*. at 2.) This was because "[t]hese actions will occur no matter where on Guam the main cantonment and family housing areas and live-fire-training range complex are situated," and the "potential environmental effects of these actions were fully and accurately considered and analyzed in the 2010 Final EIS." (*Id*.) Additionally, because the "number and size of the ranges comprising the live-fire training range complex [were] unaffected by the April 2012 adjustments to the Roadmap," they "will remain as described in the 2010 Final EIS." (*Id*.)

To formally amend the 2009 Agreement, the United States and Japan entered into a Protocol to the 2009 Agreement. The preamble was amended to strike the language stating that 8,000 III Marine Expeditionary Force personnel would be relocated to Guam, and to read instead "a total of approximately 9,000 personnel of III MEF, along with their dependents, are to be relocated from Okinawa to locations outside of Japan." (Ex. 6, Protocol at 2 (Art. 1), ECF No. 20-6.) Article 1 of the 2009 Agreement was amended to delete the reference to 8,000 III MEF personnel and instead to refer to "the III MEF personnel and their dependents." (*Id*. at 3.) Further, Articles 2 and 4 were amended to reference facilities and infrastructure in Guam and the CNMI instead of just Guam. (*Id*. at 4.)

During this same period, the Department of the Navy undertook an assessment of training ranges and supporting facilities in the U.S. Pacific Command Area of Responsibility. (Ex. O, Final Training Needs Assessment, ECF No. 22-15.) The Navy concluded that the Marianas Hub has

"significantly more unfilled training requirements than other hubs in the Pacific Command area due to "an increase in training requirements for currently based forces and the requirements for the Marines that are planned to relocate from Okinawa to Guam." (*Id*. at 5.) Further, "[u]nlike other hubs, the Marianas Hub has a less developed infrastructure allowing for more undeveloped land with potentially less encroachment pressures available for expanded training capability." (*Id*.)

After this assessment, in April 2015, the Department of the Navy prepared a draft EIS on "establish[ing] a series of live-fire ranges, training courses, and maneuver areas within the" CNMI to address the training deficiencies identified in the 2012–2013 training needs assessment. (Ex. N, CNMI Jt. Military EIS 2, ECF No. 22-14). Specifically, the draft EIS, titled "Commonwealth of the Northern Mariana Islands Joint Military Training Environmental Impact Statement/Overseas Environmental Impact Statement" ("CNMI Joint Military Training EIS"), considered the effects of constructing a "unit level Range and Training Area on Tinian and combined level Range and Training Area on Pagan." (*Id*.)

Three months later, the Department of the Navy issued its final supplemental EIS on the live-fire training range on Guam and associated infrastructure necessary to accommodate the relocation of the 5,000 Marines and their dependents. (Ex. A, Final Supplemental EIS, ECF No. 22-1.) The final supplemental EIS stated that the "decision regarding training ranges on Tinian is not affected by the 2012 Roadmap Adjustments, and remains final and is not subject to reanalysis in this EIS." However, because the draft EIS on military training on Tinian and Pagan was released in April 2015, any final decision taken "as evaluated in the [CNMI Joint Military Training EIS] would supersede the 2010 [Record of Decision] with regards to Tinian," and the Navy "has deferred any implementation of the

Tinian training program . . . pending the outcome of the [CNMI Joint Military Training EIS]." (*Id*. at 5.)

Based on the final supplemental EIS, the Navy issued a new Record of Decision. (Ex. H, 2015 R. of Decision, ECF No. 22-8.) The ROD concluded that the reduced number of Marines relocating to Guam "impact[ed] approximately 850 fewer acres than was projected in 2010," and therefore required construction of the live-fire training range only on land "currently under the custody and control of the [Department of Defense]." (*Id*. at 3.)

### III.    PROCEDURAL HISTORY

Plaintiffs filed this case pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., in relation to U.S. Department of the Navy and Department of Defense's proposal to relocate U.S. Marines from Okinawa to Guam and to build live-fire training ranges on Tinian and Pagan. (Compl., ECF No. 1.) Plaintiffs allege that defendants violated NEPA and the APA by failing to consider the connected actions of relocation of Marines to Guam and the construction and operation of live-fire ranges on Tinian and Pagan in a single EIS, or, alternatively, by failing to consider the cumulative impacts of the relocation and construction of live-fire training ranges in a single EIS. (*Id*. at 19–20.) They also claim that defendants acted arbitrarily and capriciously by failing to consider alternate locations outside of the Northern Mariana Islands "for stationing and/or training Marines relocated from Okinawa." (*Id*. at 20–21.)

Defendants seek to dismiss on the ground that the Court lacks subject-matter jurisdiction. First, according to defendants, the claims present a political question because the executive branch decided

8

to relocate the Marines as part of a treaty negotiated with Japan, and injunctive relief would require the Court to conduct foreign affairs, which is a power constitutionally committed to the political branches. (Motion 21–30, ECF No. 20.) Further, because the injury results from a "binding international agreement," the Court cannot grant meaningful relief, and plaintiffs therefore lack standing to request declaratory relief. (*Id*. at 31–33.) Next, defendants argue that plaintiffs' claims are not justiciable because there has been no final agency action and the United States has waived sovereign immunity only for review of final agency actions. (*Id*. at 33–39.) Finally, defendants submit that plaintiffs' claims are not ripe for review because decisions regarding training ranges for the Marines are not yet final, and all of the alleged NEPA and APA violations involving the construction of live-fire training ranges are based on no more than speculation of harm. (*Id*. at 39–43.)

The Court heard oral argument on the motion to dismiss on February 9, 2017. (ECF No. 28.) At a status conference on May 11, 2017, plaintiffs' counsel apprised the Court that a district court case relied on by defendants in the motion to dismiss, *Center for Biological Diversity v. Hagel*, 80 F. Supp. 3d 991 (N.D. Cal. 2015), was on appeal to the Ninth Circuit. (ECF No. 34.) On August 25, 2017, the Court held another status conference, and due to the recent issuance of the Ninth Circuit's decision, ordered supplemental briefing. (*See* ECF Nos. 36, 37.) The parties filed their supplemental briefs on September 8, 2017. (*See* ECF Nos. 38, 39.)

## IV.    RELEVANT STATUTORY PROVISIONS

NEPA requires that agencies complete an EIS for major federal actions. The scope of an EIS "consists of the range of actions, alternatives, and impacts to be considered," and to "determine the scope, . . . agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts"

listed in the relevant regulation. 40 C.F.R. § 1508.25. Actions include "connected actions, which means that they are closely related and therefore should be discussed in the same impact statement" and meet the three criteria set forth in the regulation. 40 C.F.R. § 1508.25(a)(1). Actions also include "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2). Cumulative impact is further defined as "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

Alternatives include the following: (1) no action alternative; (2) other reasonable courses of action; and (3) mitigation measures (not in the proposed action). 40 C.F.R. § 1508.25(b). These alternatives must be presented "in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

## V.    LEGAL STANDARD

Defendants bring their motion under Fed. R. Civ. P. 12(b)(1), arguing that the Court lacks jurisdiction over plaintiffs' claims because the claims involve a political question, rendering plaintiffs without a remedy for the alleged injury and without standing to pursue their claims, and because the claims involve non-final agency action for which the United States has not waived sovereign immunity. (*See generally* Defs'. Mot. to Dismiss.)   Article III standing is "a true jurisdictional question . . . [and] it is properly addressed in a Rule 12(b)(1) motion." *Norkunas v. Wynn Las Vegas, LLC*, 343 F. App'x 269, 270 (9th Cir. 2009) (citing *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004)).   The political question doctrine is also "a jurisdictional limitation imposed on the courts

by the Constitution." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 981 (9th Cir. 2007) (citing *767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Fed. Republic of Yugo.*, 218 F.3d 152, 164 (2d Cir. 2000)). Sovereign immunity is a quasi-jurisdictional defense, but it may be raised in a Rule 12(b)(1) motion. *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 927 n.2 (9th Cir. 2017).

"The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). Rule 12(b)(1) challenges may be facial or factual. "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

In a facial attack, a court must assume the allegations in the complaint to be true and "draw all reasonable inferences in [plaintiff's] favor." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (internal citations omitted). By contrast, in a factual attack, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment," and "need not presume the truthfulness of the plaintiff's allegations." *Safe Air for Everyone*, 373 F.3d at 1039. Once the moving party submits affidavits or other evidence, the opposing party "must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.* (quoting *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).

In this case, defendants bring both facial and factual challenges. First, defendants contend that the challenged action is unreviewable under the political question doctrine, which is a facial challenge,

as defendants do not attack the allegations but in effect assert that the claim on its face is unreviewable. *See Native Village of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 871 (N.D. Cal. 2009) (treating political question challenge as facial attack); *Yellen v. United States*, Case No. 14-cv-00134, 2014 WL 2532460, at *1 (D. Haw. June 5, 2014) (same). Second, defendants maintain that the agency action is not final—finality is a requirement to bring suit under the APA—and have attached several exhibits, indicating they are bringing a factual challenge to plaintiffs' claims. *See Friends of the River v. U.S. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 972 (E.D. Cal. 2012) (factual attack where defendants argued that agency actions were not final and attached exhibits for review); *Ashley Creek Props., LLC v. Timchak*, 649 F. Supp. 2d 1171, 1175–76 (D. Idaho 2009) (factual attack where defendants argued plaintiffs lacked standing and submitted exhibits for consideration). Accordingly, with respect to the political question challenge, the Court will take the allegations in the complaint as true, and with respect to the finality challenge, the Court will consider the complaint and all evidence submitted by the parties.

## VI. ANALYSIS

Defendants argue that the Court lacks jurisdiction on a number of grounds. First, they contend that the claims involve a political question and the Court therefore cannot issue injunctive relief or vacate the RODs. Relatedly, they submit that because the claims involve a political question, the Court cannot issue declaratory relief and plaintiffs lack standing. Finally, in defendants' view, the claims involve non-final agency actions and the United States has waived sovereign immunity only as to final agency actions. The Court will address the jurisdictional issues raised in the following order: sovereign immunity (finality), standing for declaratory relief, and whether the first claim presents a

political question.

### A. Whether Plaintiffs' Claims Target Final Agency Actions And Are Ripe

Defendants assert that plaintiffs' claims require the Court to review a non-final agency action, and therefore that the claims are barred by sovereign immunity and are unripe. (Motion 33–43.) Specifically, the claims are not reviewable or ripe, according to defendants, because there has been no final action taken with respect to live-fire training ranges in Pagan or Tinian. (*Id.*)

#### i. Final Agency Action

Plaintiffs allege that defendants should have considered the effects of establishing live-fire training ranges on Pagan in the same EIS covering the relocation of Marines to Guam and the live-fire training ranges on Guam and Tinian, either because these actions are connected or because they have a cumulative impact. Defendants rebut that because the Navy has made no decision as to the locations for live-fire training ranges on Tinian and Pagan, as evidenced by the fact that the CNMI Joint Military Training EIS is still in draft form, plaintiffs challenge a non-final agency action. (Motion 35–39.) Further, defendants assert that plaintiffs' "segmentation" claim fails as to Guam and Tinian because the relocation and live-fire training ranges for these islands were considered in the same EIS. (*Id.* at 36.)

Under section 702 of the APA, "[a] person suffering wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review." 5 U.S.C. § 702. "When, as here, review is sought not pursuant to specific authorization in the substantive statute . . . the 'agency action' in question must be 'final agency action.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (citing 5 U.S.C. § 704)). An agency

13

action is considered final if two conditions are met: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations and quotations omitted). Several factors provide "indicia of finality," including "whether the action amounts to a definitive statement of the agency's position, whether the action has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance with the terms is expected." *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005).

Defendants maintain that the first condition is not satisfied because the CNMI Joint Military Training EIS has not been finalized. (Motion 36.) But defendants' argument confuses the jurisdictional basis with the merits. Plaintiffs have brought this challenge under the Guam and CNMI Relocation and Training EIS and Record of Decision ("ROD"). Thus, the relevant issue for jurisdictional purposes is whether the EIS and ROD are final agency actions. There is no dispute that they are. "Once an EIS's analysis has been solidified in a ROD, an agency has taken final agency action." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010).

Indeed, the Guam and CNMI Relocation and Training EIS states that the "decision regarding training ranges on Tinian is not affected by the 2012 Roadmap Adjustments, and remains final and is not subject to reanalysis in this SEIS." (*Id*. at 5.) Moreover, although "the [Department of the Navy] has deferred any implementation of the Tinian training ranges . . . pending the outcome of the [CNMI Joint Military Training EIS]," nothing suggests that unless the CNMI Joint Military Training EIS selects alternate sites or conflicts with the Guam and CNMI Relocation and Training EIS, the decision

will be reconsidered. That different training sites on Tinian and Pagan might be selected in the future goes to the merits of plaintiffs' claims—whether the decision to establish live-fire training ranges on Tinian and Pagan is a connected action or is part of a separate analysis resulting from Pacific Command's assessment of training needs. Accordingly, the Court finds the Guam and CNMI Relocation and Training EIS and Record of Decision to represent the consummation of the agencies' decisionmaking process and therefore satisfy the first condition of final agency action.

As to the second condition, defendants submit that because the CNMI Joint Military Training EIS is not finalized, no legal consequences flow from it. Again, this argument misses the mark. Here, the Guam and CNMI Relocation and Training EIS and Record of Decision demonstrate that the Departments of the Navy and Defense have already undertaken site-specific analysis, considered alternatives, and committed to selecting sites for the main base, aviation, and waterfront operations. (*See* Ex. A, Final Supplemental EIS 3, ECF No. 22-1.) As highlighted above, the EIS itself states that the decision is final; it is only implementation that has been delayed, and short of the CNMI Joint Military Training EIS selecting new sites, the Guam and CNMI Relocation and Training EIS will remain final.

Looking at the EIS and Record of Decision in the "pragmatic and flexible matter" prescribed by the Supreme Court and the Ninth Circuit, they satisfy the second prong of the analysis. *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, ___ U.S. ___, 136 S. Ct. 1807, 1815 (2016) (discussing the "'pragmatic' approach we have long taken to finality"); *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (observing that "the 'finality element must be interpreted in a pragmatic and flexible manner'"). As set forth above, the Departments have made final decisions

with regard to relocation and have selected sites for the action. This unquestionably has practical and legal effects and sets forth the Departments' respective obligations.

Although construction on the base and training ranges has not begun, this does not resolve the inquiry as to the second condition. The second prong may be satisfied in three disjunctive ways: "if the action is one 'by which the rights *or* obligations have been determined, *or* from which legal consequences will flow." *Or. Natural Desert Ass'n*, 465 F.3d at 986. This inquiry looks at not just plaintiffs, but also the relevant agency. *See e.g.*, *Hawkes Co., Inc.*, 136 S. Ct. at 1815 (considering that the US Army Corps of Engineers issued jurisdictional determinations as to whether property contained 'waters of the United States,' and finding these determinations satisfied the second prong because they bound the Corps and EPA for five-year periods). Thus, that defendants have made final decisions as to their commitments or obligations in the Guam and CNMI Relocation and Training EIS and Record of Decision is sufficient to demonstrate that the action is final. Accordingly, lack of finality is not grounds for dismissal.

**ii. Ripeness**

Defendants next argue that plaintiffs' claims are not ripe for review because the CNMI Joint Military Training is not finalized. They contend that no harm will result to plaintiffs if the lawsuit is delayed until the EIS is final, that seeking "review of the outcome of a future event" would interfere with Pacific Command's ongoing NEPA process, and the Court would benefit from a complete administrative record. (Motion 39–43.) Plaintiffs respond that their claims are ripe for review because they challenge defendants' alleged failure to comply with NEPA and the APA in the Guam and CNMI Relocation and Training EIS, which is final. (Pls'. Br. in Opp. 49–50.)

16

"Ripeness serves 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486 (9th Cir. 2011) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). Courts consider the following factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

According to defendants, plaintiffs would suffer no hardship from delayed review because the CNMI Joint Military Training EIS is not final. However, the injury at issue is failure to comply with NEPA with respect to the Guam and CNMI Relocation and Training EIS. Once such a procedural injury has occurred, a plaintiff "may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 737 (comparing substantive challenge to forest plan that includes no guidance for use of forests to procedural challenge to inadequate EIS, and stating the former is unripe while the latter is ripe at time the document issued); *see also W. Watersheds Project*, 632 F.3d at 486 (holding NEPA challenge ripe for review because the EIS and regulations implementing EIS were final). This is because NEPA "simply guarantees a particular procedure, not a particular result." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 737.

Further, because the Guam and CNMI Relocation and Training EIS is complete, judicial review would not interfere with ongoing administrative actions. *W. Watersheds Project*, 632 F.3d at

17

486 (finding no interference where EIS and implementing regulations were final). To the extent that defendants submit that review of plaintiffs' claims relies on completion of the CNMI Joint Military Training EIS, the Court is not persuaded. Although a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted), plaintiffs' claims address the Guam and CNMI Relocation and Training EIS and Record of Decision, which are final.

Even if Pacific Command may eventually select different or additional sites for live-fire training ranges on Tinian and Pagan, the analysis would not change because defendants' reasoning appears to conflate the jurisdictional and merits questions. The Guam and CNMI Relocation and Training EIS is final and memorialized in a Record of Decision. Its completion therefore does not rely on "contingent future events." With respect to the merits, NEPA requires agencies to include reasonably foreseeable future events. Plaintiffs believe that Pacific Command's selection of sites on Tinian and Pagan is reasonably foreseeable, and adjudication of this issue is a merits question, not a reason to find that the Court lacks jurisdiction. Moreover, defendants overlook the express language of the complaint, which uses the Guam and CNMI Relocation and Training EIS as the jurisdictional hook. *See, e.g.*, Compl. ¶¶ 85, 88 (contending that "[t]he Navy's reliance on the legally deficient [final environmental impact statement and supplemental environmental impact statement] . . ." violates NEPA and the APA).

Finally, although the Court might benefit from having a complete administrative record, it is not incomplete because the CNMI Joint Military Training EIS is still in draft form. The record is incomplete because the parties have chosen not to submit the complete record from the EIS process

that began in 2007. That said, at this stage of the case, the entire record is not necessary for the Court to determine whether it has jurisdiction. Accordingly, plaintiffs' claims are ripe for review.

**B.  Whether Plaintiffs Have Standing To Seek Declaratory Relief**

Defendants next contend that plaintiffs lack standing to bring claims for declaratory relief because their claims implicate the political question doctrine.

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 815 (9th Cir. 2017). Because lack of standing deprives a court of jurisdiction, "federal courts are required *sua sponte* to examine jurisdictional issues such as standing." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002). A plaintiff has standing provided the constitutional and prudential inquiries are satisfied. To meet the constitutional requirements for standing, a plaintiff must demonstrate that it has "suffered an injury in fact," "the injury is fairly traceable to the challenged action," and "it is likely . . . that the injury will be redressed by a favorable decision." *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 950 (9th Cir. 2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)).

To satisfy the prudential standing requirements, a plaintiff must have "been granted a right to sue by the statute." *Id*. at 950. "Because NEPA does not provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act ('APA')." *Id*. To establish standing under the APA, a plaintiff must show that its "interests fall within the zone of interests protected by the law." *Lexmark Int'l, Inc .v. Static Control Components, Inc.*, ___ U.S. ___, 134 S. Ct. 1377, 1388 (2014) (internal quotations and citations omitted); *see also*

*Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir. 1995).

With respect to whether plaintiffs may seek declaratory relief, the parties dispute only the third prong of the constitutional standing test: redressability. In defendants' view, plaintiffs lack standing to seek declaratory relief because the Court cannot redress their claims through an injunction or vacatur. (Motion, 31–33.) Plaintiffs respond that because the claims do not present political questions, the Court has authority to grant the requested relief. (Pls'. Br. in Opp. 42–44.)

As set forth below, plaintiffs' first claim that defendants violated NEPA by failing to consider a connected action and/or cumulative impact in a single EIS does not implicate the political question doctrine, and the Court may issue injunctive relief or vacate the RODs if the merits of the case so require. Thus, plaintiffs' first claim is redressible, and defendants' motion to dismiss the first claim for lack of standing is denied.

By contrast, plaintiffs' second claim that defendants violated NEPA by failing to consider alternate locations for sending Marines from Okinawa implicates the political question doctrine because adjudicating the dispute would require the Court to second-guess the military decision to relocate to Guam and establish a base with associated training there and on Tinian. Requiring defendants to consider alternative locations after the decision to move to Guam and Tinian was made in conjunction with negotiations to remove Marines from Okinawa interferes with a decision made using military expertise. Thus, the Court cannot issue an injunction or declaration that defendants violated NEPA by failing to consider places outside of Guam and the CNMI for relocation. Accordingly, a declaration would not resolve plaintiffs' claims, and they therefore lack standing to pursue declaratory relief for the second claim.

20

### C. Whether Plaintiffs' Claims and Request for Injunctive Relief Present A Political Question

Defendants assert that plaintiffs' claims, insofar as they request injunctive relief, are not justiciable because the decision to relocate Marines to Guam and establish a base with all related training activities on Guam and Tinian is a political question. (Motion 21–30.) In response, plaintiffs content that the requests for injunctive relief do not implicate the political question doctrine because NEPA "is a purely procedural statute" that does not require defendants to change their decisions. (Pls'. Br. in Opp. 29–42.)

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)). A "narrow exception to that rule [is] the 'political question' doctrine." *Id*. at 195 (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). Courts assess the following six factors, articulated in *Baker v. Carr*, to determine if a controversy involves a political question:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962) (quoted in *No GWEN Alliance of Lane Cnty., Inc. v. Aldridge*, 855 F.2d 1380, 1383–84 (9th Cir. 1988)).

"The Supreme Court recently has placed more weight on the first two factors: (1) 'a textually demonstrable constitutional commitment of the issue to a coordinate political department' or (2) 'a lack of judicially discoverable and manageable standards for resolving' the question." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 822 (9th Cir. 2017) (citing *Zivotofsky*, 566 U.S. at 195; *Nixon v. United States*, 506 U.S. 224, 228 (1993)). Because at least one of the six factors must be "inextricable from the case" for the doctrine to apply, a court must make "a discriminating inquiry into the precise facts and posture of the particular case." *Baker*, 369 U.S. at 217.

### i.   Whether the First Claim Is A Political Question

Plaintiffs' request for injunctive relief as to the first claim is unjusticiable, defendants maintain, because the decision to relocate the Marines to Guam implicates the political question doctrine. Plaintiffs disagree.

### a.   Textually Demonstrable Commitment to Political Branch

Defendants submit that the relocation of Marines to Guam is a decision already made by the executive branch and is "also the subject of a binding international agreement" between the Governments of the United States and Japan. (Motion 23–24.) Further, they contend, this decision affects the conduct of foreign relations, which is an area textually "committed by the Constitution to the Executive and Legislative" branches. (*Id*. at 22–23 (quoting *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)). Thus, the Court cannot issue injunctive relief or vacate the Record of Decisions because the Court, not the political branches, "would be directing the course of foreign affairs" by "forbidding the Executive Branch from implementing its chosen political and diplomatic strategies." (*Id*. at 24.)

Plaintiffs respond that the requested injunction would not require the Court to second-guess or conduct foreign affairs because NEPA is procedural and does not dictate particular outcomes. (Pls'. Br. in Opp. 31.) Further, plaintiffs submit, defendants have repeatedly changed the relocation plans, and the text of the agreement allows the United States to "take necessary measures for the Relocation," which "contemplates compliance with applicable environmental laws." (*Id*. at 32–33.) Finally, because it is "unclear whether Plaintiffs will ever need to request an injunction," dismissal is premature. (*Id*. at 30.)

As an initial matter, there is no dispute that the conduct of foreign affairs is constitutionally committed to the political branches. *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918); *Bancoult v. McNamara*, 445 F.3d 427, 433–34 (D.C. Cir. 2006) (listing constitutional provisions entrusting foreign affairs and national security to political branches). But defendants overstate the extent to which the political question doctrine applies when foreign affairs and national security or defense are at issue. As the Supreme Court has emphasized, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211; *see also Japan Whaling Ass'n*, 478 U.S. at 229–30.

In this case, one of the political branches—Congress—"has expressed its intent regarding an aspect of foreign affairs" through enactment of NEPA. *Ctr. for Biological Diversity*, 868 F.3d at 823.[3]

---

[3] Although in *Center for Biological Diversity* the Ninth Circuit was considering the National Historic Preservation Act ("NHPA"), "NHPA is similar to NEPA except that it requires consideration of historic sites, rather than the environment." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006). "NHPA, like NEPA, is a procedural statute requiring government agencies to 'stop, look, and listen' before proceeding with agency action." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 610 (9th Cir. 2010). Thus, the Ninth Circuit's discussion of NHPA's impact on the conduct of foreign affairs in *Center for Biological Diversity* is equally applicable to this case.

Thus, although the first *Baker* factor may "implicate a broader deference to the political branches' judgment in foreign affairs, that deference cuts in both directions." *Id*. NEPA requires all federal agencies to evaluate the environmental impacts of proposed major federal actions, and to prepare environmental impact statements if the actions "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(c); *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 763 (2004).

"There is no 'national defense' exception to NEPA." *No GWEN Alliance of Lane Cnty., Inc.*, 855 F.2d at 1384. This is because NEPA "attempt[s] to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of every federal agency." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1177 (9th Cir. 1982). A court therefore must take into consideration the constitutional commitment of foreign affairs to the political branches as well as the statutory mandate of NEPA, which expresses Congress' intent as to how the executive branch may conduct foreign affairs.

Reviewing compliance with NEPA insofar as plaintiffs seek inclusion of connected actions or cumulative impacts does not require "a review of the merits" of the decision to relocate Marines to Guam or to establish live-fire training ranges on Guam and Tinian. Instead, plaintiffs "want to insure that the [agencies] compl[y] with the National Environmental Protection Act (NEPA)) . . . by considering all of the environmental effects" of relocating the Marines and constructing the associated infrastructure. *No GWEN Alliance of Lane Cnty., Inc.*, 855 F.2d at 1384. This requires a court to "engage in the 'familiar judicial exercise' of reading and applying a statute, conscious of the purpose expressed by Congress." *Ctr. for Biological Diversity*, 868 F.3d at 823 (citing *Zivotofsky*, 566 U.S. at 196.) As the Ninth Circuit has recently reiterated with regard to the NHPA, which is comparable to

NEPA, it is error to assume that issuing an injunction to ensure compliance with procedural obligations requires the court to pass judgment on the merits of the agency's decision. Instead, "the relevant question . . . for injunctive relief is compliance with [NEPA]." *Id.* at 828.

In sum, plaintiffs' first claim asks the Court to interpret and apply NEPA, not to evaluate the policy decisions or value determinations made by the Navy, and issuing an injunction would not interfere with these decisions. Put another way, although "military judgments generally" raise political questions, a court must determine if the action taken involved "*military* expertise and judgment." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281–82 (11th Cir. 2009). Deciding whether an action is connected or would create cumulative impacts and therefore must be included in an EIS does not involve military expertise, as evidenced by the fact that all federal agencies are subject to NEPA. Therefore, entering an injunction would not second-guess decisions taken with military expertise.

This is true even though the relocation commitment is included in a binding agreement with Japan. Plaintiffs' first claim does not seek to enjoin the relocation permanently or force the Marines to relocate to another site. They seek only to enjoin the relocation until the Department of the Navy and Department of Defense complete an EIS that considers connected actions or cumulative impacts. Nothing in the text of the agreements between the United States and Japan sets forth a timetable for relocation. Consequently, an injunction would not countermand or interfere with the terms of a treaty.

Second, the 2009 Agreement states that the United States "shall take necessary measures for the Relocation." (2009 Agreement art. 2.) Plaintiffs contend this contemplates compliance with NEPA. Regardless of whether plaintiffs' contention is correct, the Agreement does not expressly

25

suggest that the relocation is exempt from NEPA. Indeed, when the first final EIS was issued in July 2010, it stated, "The proposed federal actions are subject to NEPA." (2010 Final EIS 3.) For defendants to now argue that because the relocation was confirmed in a binding international agreement all actions related to it implicate the political question doctrine borders on disingenuous. Accordingly, the Court finds that issuing an injunction as to the first claim, if determined appropriate, would not second-guess the merits of the decision or improperly interfere with decisions taken by the political branches. *See No GWEN Alliance of Lane Cnty., Inc.*, 855 F.2d at 1384–85 (finding no political question when court issued injunction against defense installation for failure to consider effects of nuclear war in EIS).

The numerous cases cited by defendants to demonstrate that injunctive relief would require the Court to improperly second-guess or conduct foreign affairs are unpersuasive. Contrary to the procedural compliance that plaintiffs seek in the first claim, the cases cited by defendants required the courts to determine whether specific military acts or decisions made with classified intelligence were wrongful. *See, e.g.*, *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948) (airline's challenge to president's decision to deny it a permit to engage in overseas transport was political question because it was based on intelligence that should not be made available to public); *El Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010) (law-of-nations claim would require court to find a military act wrongful and unjustified as an element of the claim, and therefore is a political question); *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) (tort claims related to executive branch's alleged attempt to aid military coup was political question because resolving the claims would require judiciary to pass judgment on whether military actions were wrongful).

Here, plaintiffs' first claim does not seek a determination that any substantive part of defendants' relocation decision was wrongful. Rather, plaintiffs seek a determination that the failure to consider a connected action or cumulative impacts in the EIS was procedurally wrongful. Issuing an injunction would therefore not require the Court to pass judgment on or second-guess the political branches' decision to relocate Marines to Guam.

Another set of cases relied on by defendants emphasizes that the conduct of foreign affairs is constitutionally committed to the political branches, but they do not involve political question claims. For example, *Crosby v. Nat'l Foreign Trade Council*, concerning a Massachusetts statute that barred state agencies from purchasing from companies doing business with Burma, was decided on grounds of preemption, not the political question doctrine. 530 U.S. 363 (2000). Additionally, *Haig v. Agee*, involved a First and Fifth Amendment challenge to a statute authorizing the Secretary of State to revoke citizens' passports if their overseas activities caused or were likely to cause serious damage to national security, and did not address the political question doctrine. 453 U.S. 280 (1981). Thus, these cases do no more than reiterate the undisputed principle that the political branches conduct foreign affairs and the courts do not.

Finally, defendants rely on *Earth Island Institute v. Christopher*, 6 F.3d 648 (9th Cir. 1993) to demonstrate that the Court may not grant injunctive relief. (Motion 20.) In *Earth Island Institute*, the Ninth Circuit addressed a statute that, among other things, required the Secretary of State to negotiate with other countries to protect sea turtles. *Id*. at 650. The Ninth Circuit held that this portion of the statute was unconstitutional because it ordered the executive to negotiate, and the courts could not "lawfully order the Executive to comply with the terms of a statute that impinges upon power

27

exclusively granted to the Executive Branch under the Constitution." *Id*. at 653.

This case does not address instances in which a Court may not issue an injunction due to the presence of a political question. As the Ninth Circuit stated in *Center for Biological Diversity*, defendants' position "seems to veer close to arguing that [NEPA] is an unconstitutional infringement on executive power," and if so, "it would be of no relevance to our political question analysis because whether the statute is an unconstitutional infringement . . . is a merits issue." 868 F.3d at 823. Accordingly, the first *Baker* factor is not implicated.

### b. Judicially Manageable Standards

Defendants next dispute that there are judicially manageable standards that "the Court could apply to decide whether the Navy had weighed appropriately the decision to station and train Marines in Guam against other strategic alternatives." (Motion 25–26.) In defendants' view, to issue injunctive relief, the Court would be required to balance the hardships and determine whether the public interest would be served by an injunction, and the Court "lacks the institutional tools and responsibility" to address these factors. (*Id*.) For example, the Court must "weigh in the balance the potential fallout flowing from the United States' failure to live up to commitments to its allies," and evaluation of this harm "is an exercise for which the Judiciary has neither aptitude, facilities nor responsibility." (*Id*. (internal quotations and citations omitted).)

To obtain injunctive relief, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011) (per curiam) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Defendants cite two cases to support their arguments. First, they rely on *El Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010), in asserting that courts are not the proper forum for reconsidering the wisdom of discretionary decisions of the political branches, and the court therefore cannot balance the hardships to determine whether to issue an injunction. Next, they rely on *Center for Biological Diversity v. Hagel*, 80 F. Supp. 3d 991 (N.D. Cal. 2015), for the proposition that courts lack the tools and aptitude to evaluate the types of harm to national security and international commitments at issue here.

*El Shifa Pharmaceutical Industries* involved a law-of-nations claim in which plaintiffs sought a declaration that "the United States violated international law by failing to compensate them for the unjustified destruction of their property." 607 F.3d at 839–40. The property at issue was a pharmaceutical plant that plaintiffs alleged the U.S. military mistakenly believed was associated with Osama bin Laden and bombed. *Id.* at 838. The D.C. Circuit held that the second *Baker* factor weighed in favor of finding the claim a political question because granting the requested relief—declaratory, not injunctive—would require the court to decide whether the military strike was "mistaken and not justified," and such decisions were "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Id.* at 845.

*El Shifa* does not assist defendants because it involved a substantively different claim that directly alleged that the military's decision, an air strike, was unjustified. By contrast, plaintiffs' first claim alleges that defendants did not include all relevant information in the EIS, and does not allege

that the substantive decisions to relocate Marines to Guam and establish related infrastructure are mistaken or unjustified.

Similarly, defendants' reliance on *Center for Biological Diversity* is unavailing. The relevant part on which defendants rely was reversed by the Ninth Circuit, which found the NHPA claim did not implicate the second *Baker* factor.[4] In the district court, the Government claimed a number of national security interests and international implications related to the decision to build a military base on Okinawa. *See* 80 F. Supp. 3d at 1012 ("maintaining the United States' deterrence capability in Asia, sustaining public support in Okinawa for the United States military presence, addressing the threat posed by a nuclear-armed North Korea or defusing tensions over competing territorial and maritime claims in the East China Sea and South China Sea" (internal quotations omitted)). The Ninth Circuit rejected these interests as sufficient to satisfy the *Baker* factors, holding that courts were capable of balancing security interests when deciding whether to grant an injunction and therefore that "the Government's asserted interests are compatible with judicial resolution under the four-part injunction analysis." *Ctr. for Biological Diversity*, 868 F.3d at 828–29; *see also No GWEN Alliance of Lane Cnty., Inc.*, 855 F.2d at 1384–85 (finding no political question when court issued injunction against defense installation for failure to consider effects of nuclear war in EIS); *Makua v. Rumsfeld*,

---

[4] Since the Ninth Circuit reversed the district court in *Center for Biological Diversity*, defendants have submitted that case is not controlling because the facts are distinguishable. Specifically, defendants contend that the *Center for Biological Diversity* case involved a challenge to details of a military base's construction rather than to the policy decision to relocate Marines to Guam, which explains why the first is not a political question but the latter is. (*See generally* Defs'. Supplemental Br., ECF No. 38.) Plaintiffs criticize defendants' new position as to whether *Center for Biological Diversity* controls or applies to this case, stating the "Ninth Circuit's unanimous decision reflects a wholesale repudiation of the arguments." (Pls'. Supplemental Br. 2–3, ECF No. 39.) As set forth above, the Court finds the Ninth Circuit's reasoning and analysis controlling in this case. However, that defendants have submitted new arguments on the basis of new case law is not improper, and plaintiffs' derision of it is unwarranted.

163 F. Supp. 2d 1202 (D. Haw. 2001) (issuing preliminary injunction with respect to resumption of live-fire training exercises after, among other things, balancing hardships to plaintiff against "importance of national security and live-fire training").

The Ninth Circuit's analysis of whether there are judicially manageable standards for addressing defendants' national security and foreign policy concerns is controlling. That this case also involves an international binding agreement does not alter this analysis. As discussed above, the Agreement and Protocol do not suggest defendants are exempt from NEPA, thus plaintiffs' first claim indicates that this is a case in which the Court can weigh national security concerns when balancing the equities. Accordingly, the Court finds that it is "able to weigh equitable considerations when security or foreign affairs interests are at stake," and the second *Baker* factor is not implicated. *Ctr. for Biological Diversity*, 868 F.3d at 829.

### c. Remaining *Baker* Factors

Defendants argue that the final *Baker* factors are implicated because issuing an injunction as to plaintiffs' first claim would require the Court to engage in policymaking, and would interfere with or contradict the strategic decisions of the United States and the international negotiations reached with Japan. (Motion 28–29.)

The third factor, whether it is impossible to resolve the issue "without an initial policy determination of a kind clearly for nonjudicial discretion," is not implicated. The focus for a NEPA case is compliance with the statute. Deciding whether defendants adequately complied with NEPA does not require the Court to make any policy determinations with regard to the relocation of Marines to Guam and the related activities. Instead, the Court must decide whether the EIS included all

31

statutorily required information.  Moreover, injunctive relief does not require the Court to make policy decisions.  *Ctr. for Biological Diversity*, 868 F.3d at 829 ("Assessing the equities of injunctive relief does not require "an initial policy determination of a kind clearly for nonjudicial discretion.").

The last three factors are prudential in nature, and "[c]ourts should be particularly cautious before forgoing adjudication of a dispute on the basis that judicial intervention" implicates one or more of these factors.  *Zivotofsky*, 566 U.S. at 204.  Thus, where the first three *Baker* factors are not implicated, finding a case unfit for review based on the final three factors is "rare" and presents an "unusual case."  *Id*. at 205.

In this case, the fourth factor is not implicated because enjoining executive action "expresses respect for Congress by vindicating its legislative power" and the mandate it imposed on federal agencies by enacting NEPA.  *See Ctr. for Biological Diversity*, 868 F.3d at 829.  In addition, requiring NEPA compliance does not suggest the Court finds the underlying decision to relocate Marines to Guam and implement related training sites mistaken.  An injunction indicates only that the Court finds the EIS to be inadequate, not that the actual substantive decision was incorrect or needs to be changed.

The fifth factor, whether there is "an unusual need for unquestioning adherence to a political decision already made," carries some weight in this case.  There is little doubt that the Governments of the United States and Japan have gone to great lengths to prepare the Roadmap for Realignment and relocation of the Marines to Guam.  But as discussed at length above, plaintiffs' first claim does not require the Court to question the substantive political decision.  Imposing an injunction, if merited, to require an EIS that includes an assessment of connected actions or cumulative impact does not require a change in the political decision or suggest that the foreign policy decision was wrong.

32

Generally, enforcing NEPA "does not intrude on foreign policy judgment, and it would be a 'rare case' where" reliance on this factor would bar judicial review. *Ctr. for Biological Diversity*, 868 F.3d at 825, 829. Moreover, the facts here do not present such a rare case. There is no timetable for implementation, and a number of considerations by both governments have delayed or altered the decision over time. As the Ninth Circuit has suggested, years of negotiation, study, and multiple reviews of decisions may weigh against finding that there is an unusual need for unquestioning adherence to a political decision. *Id*. at 825–26. These circumstances are present here, and therefore weigh against finding this to be a rare case in which this factor should bar judicial review.

The sixth factor—potentiality of embarrassment from multifarious pronouncements by various departments on one question—is not implicated. "An injunction here does not pronounce anything, and though it might imply internal conflict between the branches of government to outside observers, it does not speak on behalf of the United States." *Ctr. for Biological Diversity*, 868 F.3d at 829. An injunction would not second-guess the decision to relocate Marines or imply it was incorrect, or question the military expertise used to reach the political decision. Instead, it would question, at most, the judgment used in complying with the mandate of NEPA, and this does not implicate military judgment. Thus, there are not multiple pronouncements on the same question.

For the reasons set forth above, none of the *Baker* factors are implicated with respect to issuing injunctive relief based on plaintiffs' first claim. Defendants' motion to dismiss this claim based on the political question doctrine is denied.

### ii.  Whether Claim Two Is A Political Question

Defendants' final argument is that the request for injunctive relief as to the second NEPA claim

33

is barred by the political question doctrine because it challenges the Navy's decision to relocate the Marines to Guam. Plaintiffs again state that because they seek only procedural compliance, the claim does not implicate the political question doctrine.

### a. Textually Demonstrable Commitment to Political Branch

Conduct of foreign affairs is constitutionally committed to the political branches. However, this commitment must be weighed against Congress' decision to limit one aspect of how the executive branch conducts foreign affairs by subjecting all federal agencies to NEPA.

Plaintiffs' second claim and request for injunctive relief presents significantly different concerns than their first claim. Instead of requesting an injunction until defendants consider a connected action or cumulative effects, plaintiffs request an injunction until defendants consider alternate sites for relocating the Marines and constructing the base with all related training ranges. As the Ninth Circuit suggested in *Center for Biological Diversity*, plaintiff's claims were reviewable, in part because "it is not necessary to review the establishment or location of the base to consider whether to enjoin the Government from undertaking any activities in furtherance" of the proposed action. 868 F.3d at 827–28.

By contrast, requiring the Government to consider alternative sites for the relocation, even if not mandating that an alternate site ultimately be selected, is inextricably linked with the initial military decision to relocate Marines to Guam. Compare this claim to the first claim. The first claim does not suggest the location should be revisited or changed. Instead, it alleges the Navy and Department of Defense failed to consider additional actions, which goes to whether the proposed actions in the CNMI Joint Military Training EIS meet the statutory or regulatory criteria of "connected action" or

"cumulative impact." Whether these other actions should be included is therefore not based on military expertise. But the second claim asserts that the Navy and Department of Defense failed to consider alternate sites for the relocation, which goes directly to the military expertise used in formulating the relocation plan. Thus, ordering an analysis of alternate sites would "require[e] hindsight review of the wisdom of military decisions." *McManaway v. KBR, Inc.*, 554 F. App'x 347, 352 (5th Cir. 2014) (discussing when political question applies to military decisions).

That the Court should be more hesitant to permit injunctive relief as to plaintiffs' second claim is borne out by a number of cases discussing the sensitive military judgment and national security implications that go into selecting military base locations. First, in *Center for Biological Diversity*, the Ninth Circuit did not disagree with the district court's conclusion that "decisions to 'establish' a military base are generally unreviewable." 868 F.3d at 827. Several other circuits have reached the same conclusion. As the D.C. Circuit explained, the decision to establish a military base is not reviewable because "[t]hat decision was an exercise of the foreign policy and national security powers entrusted by the Constitution to the political branches." *Bancoult v. McNamara*, 445 F.3d 427, 436 (D.C. Cir. 2006). "If that decision is to be reconsidered, 'the people are and must be, in a sense, at the mercy of their elected representatives.'" *Id.* (quoting *Pauling v. McNamara*, 331 F.2d 796, 799 (D.C. Cir. 1963)). Similarly, "a challenge to the President's decisions regarding the training, weaponry and orders" of the military presents a political question." *El-Shifa Pharm. Indus. Co. v. United States*, 559 F.3d 578, 591 (D.C. Cir. 2009), *vacated and affirmed en banc*, 607 F.3d 836 (D.C. Cir. 2010). As the Eleventh Circuit summarized, "the political question doctrine has been deemed applicable to military training policies . . . and the location of military bases." *Carmichael*, 572 F.3d at 1287–88 (collecting

35

cases).

Although these cases do not involve NEPA challenges, the underlying message is clear: location and establishment of military bases and inherently connected activities are not reviewable because they involve policy determinations constitutionally committed to the political branches. Even though NEPA is a procedural statute and would not mandate defendants relocate the Marines and related infrastructure to a site other than Guam or Tinian, the procedural requirement to consider alternative sites necessarily collides with the underlying substantive decision. Thus, to require defendants to consider alternative locations would require the Court to second-guess policy decisions with significant foreign policy, security, and diplomatic consequences. This creates the precise separation of powers problem that the political question doctrine was designed to avoid.

Plaintiffs cite a number of cases in support of their argument that NEPA compliance does not second-guess a political decision because NEPA challenges procedure, not substance. (*See* Pls'. Br. in Opp. 21–24.) The parties do not dispute this general rule. But injunctive relief may so affect or undermine a substantive decision that the political question doctrine may be implicated. Moreover, only one of the cases cited by plaintiffs involved a political question claim. In that case, *Sneaker Circus, Inc. v. Carter*, plaintiffs argued that the executive branch failed to comply with procedures mandated by the Trade Act of 1974 when negotiating trade agreements with Korea and China. 566 F.2d 396, 398 (2d Cir. 1977). The court held that the challenge was not a political question because the injunction and claim did not go to the merits of the trade agreements, did not interfere with the decision to enter into or negotiate the treaties, but addressed the "procedures which are mandated by statute, and which accordingly are within the proper supervision of the federal courts." *Id*. at 402.

36

The *Sneaker Circus* case is not controlling precedent and does not resolve the issue here. Issuing injunctive relief in that case would not have prevented the executive branch from concluding the trade agreements and did not that suggest the content of the agreements should be altered. By contrast, issuing an injunction in this case and forcing defendants to consider alternative sites for the relocation of Marines and related base would require the Court to second-guess the military judgment that Guam and Tinian were the appropriate locations. To be sure, requiring defendants to consider alternate locations would itself not dictate a different decision on the merits. However, the act of ordering defendants to consider alternate sites directly undermines or questions the initial relocation decision that was made with military expertise. The Court is not authorized to second-guess or initiate such policy decisions, nor capable of doing so.

Finally, plaintiffs cite one case, *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006), that merits discussion even though it does not address the political question doctrine. To implement the Army Transformation Campaign Plan, designed to create a "more responsive, deployable, . . . and sustainable" Army, the Army carried out a programmatic EIS and issued a Record of Decision. 464 F.3d at 1087–88. In the programmatic EIS, the Army identified the 2nd Brigade in Hawaii as a unit to be "transformed" into a Stryker Brigade Combat Team in Hawaii. *Id*. Subsequently, the Army did a site-specific EIS on transforming the brigade in Hawaii. *Id*. Plaintiffs argued that the Army violated NEPA by, among other things, failing to consider alternative locations for transforming the 2nd Brigade. The Ninth Circuit agreed, stating that the Army erred because it identified Hawaii as the location for transformation in the programmatic EIS without considering alternative locations, and also failed to do so in the site-specific EIS. *Id*. at 1096–97. In particular,

the Ninth Circuit relied on three things to reach this conclusion. First, the mission, which was "to enable to Army to achieve the force characteristics articulated in the Army Vision in the most timely and efficient manner possible," and to "address the changing circumstances of the 21st Century," did not itself demonstrate that Hawaii was the appropriate location. *Id*. at 1098. Instead, based on the generic mission, the Army "leap[ed] to the assumption that transformation in Hawaii or no action are the only alternatives." *Id*. Second, "the Army's own experts recognized that the failure to undertake this analysis in the PEIS created a problem under NEPA," and Army personnel did not understand why Hawaii was selected. *Id*. at 1098–99. Third, the rationale given for not addressing alternatives was "undermined by the record" and contradicted by the in-court arguments. *Id*. at 1099.

That the Ninth Circuit ordered the Army to consider alternative locations for transforming the 2nd Brigade may suggest that the Court may order defendants to consider alternative locations for the Marines and related training needs. However, *'Ilio'ulaokalani Coalition* does not compel this conclusion. First, the Army's program did not start with the site-specific goal of modernizing the 2nd Brigade in Hawaii. Instead, it outlined a broad program and then chose brigades to include. Here, the relocation of Marines from Okinawa has always contemplated Guam as the relocation center, both by the United States and Japan. (*See* Ex. 1, U.S.-Japan Roadmap, ECF No. 20-1.) It is immaterial that the Government has changed how many Marines will go to Guam. All decisions beginning with the Roadmap, and leading to the 2009 Agreement and 2013 Protocol retained the contours of the original plan, which was to relocate a number of Marines to Guam. In fact, the title of the 2009 Agreement is "The Agreement . . . Concerning the Implementation of the Relocation of III Marine Expeditionary Force Personnel and Their Dependents from Okinawa to Guam," and the Protocol did not change this.

(*See* 2009 Agreement, Ex. 2, ECF No. 20-2; 2013 Protocol, Ex. 6, ECF No. 20-6.)  In other words, this specific action did not result from a programmatic EIS as the Army's decision to transform the 2nd Brigade in Hawaii did.  Rather, it is a specific decision resulting from negotiations and consultations with Japan.  For the Court to issue an injunction here would second-guess these negotiations rather than an assumption made in a PEIS.

Second, in *'Ilio'ulaokalani Coalition*, the Ninth Circuit appeared concerned that the Army itself recognized that it should have considered alternatives, suggesting that the decision to go to Hawaii was not the product of a thoughtful process, military or otherwise.  Similarly, the court indicated that the inconsistent rationales given by the Army for why Hawaii was selected reflected an incomplete analysis.  By contrast, defendants' decision to relocate the Marines to Guam represents over a decade of diplomatic negotiations and consideration of foreign affairs.  Even though the number of Marines to be transferred to Guam has changed, the Government has never been inconsistent in its views that the Marines must be relocated to Guam.  The Court finds plaintiffs' reliance on *'Ilio'ulaokalani Coalition* to be unpersuasive.

Accordingly, the first *Baker* factor weighs in favor of finding that plaintiffs' request for injunctive relief on the second claim raises a political question.

### b.  Judicially Manageable Standards

The second *Baker* factor also demonstrates that plaintiffs' request for injunctive relief on the second claim is a political question.  Although courts are able to balance the hardships in many cases involving national security concerns and may issue injunctions in such cases, in this case, the Court cannot weigh all equitable concerns without confronting the substantive decision to relocate to Guam

and Tinian.

When balancing the hardships to determine whether an injunction should issue, as well as considering the public interest, the Court must consider the hardships to all parties. Here, although defendants would not be required to choose an alternative location, they would have to consider sites in addition to the initially selected location. As discussed above, the initial selection of Guam and Tinian for the relocation effort is a decision constitutionally committed to the political branches. Attempting to assess the hardship to defendants by ordering them to revisit this decision, as with the first *Baker* factor, unavoidably leads the Court to second-guess the military judgment. In other words, mandating consideration of alternative locations implies that there are alternative locations, and the Court has no aptitude for making such a judgment. Accordingly, the specific circumstances are not compatible with judicial resolution.

Plaintiffs rely on five cases in support of their argument that the Court can grant injunctive relief on their second claim. First, they rely on *'Ilio'ulaokalani Coalition*. As discussed above, *'Ilio'ulaokalani Coalition* involved different circumstances leading to the Ninth Circuit's decision that the Army must consider alternative sites. Because the decision to relocate to Guam has been a consistent part and focus of the Roadmap between the United States and Japan, for the Court to require consideration of alternative sites would entail second-guessing the substantive decision. Thus, *'Ilio'ulaokalani Coalition* does not persuade the Court that there are judicially manageable standards with regards to plaintiffs' second claim. This is equally true for *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202 (D. Haw. 2001), in which the district court assessed whether to issue a preliminary injunction against the military for failing to complete an EIS before resuming live-fire training exercises at a base

40

in Hawaii. Nothing in that case required the military to consider moving—as opposed to resuming—the planned action. Instead, it addressed the military's failure to consider *any* environmental impacts associated with resuming live-fire training exercises. *Id*. at 1206.

Next, plaintiffs rely on *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). In the district and appeal courts, the issue was whether plaintiffs were entitled to a preliminary injunction against the Navy for violating NEPA. *Id*. at 16–20. Plaintiffs alleged that the Navy improperly determined that its sonar training exercises would not have a significant impact on the environment and therefore was not required to complete an EIS. *Id*. at 15–16. The Supreme Court considered the discrete issue of whether the lower courts had applied the appropriate standard for a preliminary injunction, and held that they erred in stating there was a "possibility" of injury rather than irreparable injury. *Id*. at 21–22. Further, the Court held that the threat to national security from the injunction clearly outweighed the outcome sought, which was that the Navy prepare an EIS, and vacated the preliminary injunction. *Id*. at 32.

As with *'Ilio'ulaokalani Coalition*, the *Winter* case does not resolve the question here. Undoubtedly, there are many circumstances in which a court can easily apply the four-part test and balance the equities even when national security is at stake. But *Winter* does not provide guidance on how or if a court can issue an injunction if the wisdom of the underlying substantive decision is inherently intertwined with balancing the hardships.

This is also true of *Weinberger v. Romero-Barcelo*, which does not address how or whether a court can issue injunctive relief when weighing the equities would require the court to second-guess a military decision that was designed with the express purpose of relocating Marines to a specific

41

location. In *Weinberger*, the Supreme Court considered a case involving the Navy's bombing exercises on Vieques Island. 456 U.S. 305, 307 (1982). The Supreme Court was not asked to address whether the exercise was a political question, but whether the Federal Water Pollution Control Act ("FWPCA") required or permitted a court to enjoin the discharge of all pollutants where the polluter did not first obtain a permit from the Environmental Protection Agency ("EPA"). *Id*. at 311. The First Circuit had held that the FWPCA mandated injunctions be put in place until the EPA issued a permit. *Id*. at 310. Interpreting the relevant statutory provisions, the Supreme Court held that the statute did not mandate injunctive relief in all cases, but permitted it. *Id*. at 320.

Finally, plaintiffs rely on *National Audubon Society v. Department of the Navy*, to demonstrate that judicially manageable standards exist in cases implicating national security. The Navy determined that its existing landing field for its aircraft was insufficient, and set about looking for a new location, identifying a number of potential sites for a new landing field. 422 F.3d 174, 181–82 (4th Cir. 2005). Plaintiffs sued, arguing that the Navy failed to adequately consider the environmental impacts at one of the identified sites. *Id*. at 183. The district court issued a permanent injunction, and defendants appealed. On appeal, the Fourth Circuit concluded that the injunction was overly broad and ordered the district court to modify it. *Id*. at 207.

Again, this case is not controlling here. In *National Audubon Society*, not only had the Navy not settled on a site, but plaintiffs also were not seeking an order that the Navy assess alternative locations, as is the case here. Thus, that the Court was able to grant an injunction in *National Audubon Society* does not resolve the matter here.

In sum, because the Court cannot balance the hardships without considering whether

42

defendants must consider alternative locations and thereby require the Court to second-guess the decision to relocate to Guam, the Court lacks judicially manageable standards to issue an injunction. Accordingly, the second *Baker* factor demonstrates that the request for injunctive relief as applied to the second claim is a political question.

### c. Other *Baker* Factors

Because the two most significant *Baker* factors show that the Court cannot issue injunctive relief on plaintiffs' second claim, the Court need not analyze the remaining *Baker* factors. *See Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (*Baker* factors "are probably listed in descending order of both importance and certainty"); *Zivotofsky*, 566 U.S. at 197–98 (analyzing first two factors before concluding no political question existed).

## VII. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the complaint (ECF No. 19) is granted in part and denied in part. In particular, the motion is denied as to the first claim for defendants' failure to consider relocation to Guam and associated live-fire training in a single environmental impact statement. However, the motion is granted as to the second claim for defendants' failure to consider alternatives; this second claim is dismissed with prejudice.

Pursuant to Fed. R. Civ. P. 12(a)(4)(A), defendants shall file their responsive pleading to the first claim within 14 days of this order.

IT IS SO ORDERED this 13th day of October, 2017.

RAMONA V. MANGLONA, Chief Judge

43