F I L E D
Clerk
District Court

AUG 31 2018

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| TINIAN WOMEN ASSOCIATION, GUARDIANS OF GANI, PAGANWATCH, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, RICHARD SPENCER, Secretary of the Navy, UNITED STATES DEPARTMENT OF DEFENSE, and JAMES MATTIS, Secretary of Defense,<br><br>　　　　Defendants. | Case No.: 16-cv-00022<br><br><br>**AMENDED DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## I.　　INTRODUCTION

This case involves a procedural challenge to the Department of Defense and Department of the Navy's final decisions to relocate thousands of Marines from Okinawa to Guam and to construct training and base facilities on Guam and the island of Tinian that are necessary to meet their needs. Plaintiffs seek a court ruling that these final decisions were made in violation of the National Environmental Policy Act, commonly known as NEPA. NEPA requires agencies to assess the environmental consequences of all proposed major federal actions in environmental impact statements so that the public understands what factors agencies have considered, and so that agencies adequately consider the effects of their actions before choosing whether or not to take them.

Here, Defendants have completed a final environmental impact statement ("EIS") and

supplemental environmental impact statement ("SEIS") that analyze the effects of the relocation of Marines to Guam and related rebasing and training activities on Guam and Tinian. Plaintiffs claim that these finalized documents are deficient because they fail to include an analysis of the environmental impacts that will stem from range and training areas on Tinian and Pagan separately proposed by Defendants. Specifically, Plaintiffs claim that the proposed range and training areas on Tinian and Pagan and the final decisions about the relocation and training of Marines on Guam and Tinian are "connected actions" that should have been assessed in a single environmental impact statement. Alternatively, Plaintiffs allege that the proposed range and training areas in Tinian and Pagan will add to the environmental effects resulting from the relocation of Marines to Guam, and therefore the additional effects—"cumulative impacts"—should have been addressed in the environmental impact statements relating to the relocation efforts.

At this stage of the litigation, Plaintiffs and Defendants have each filed a motion for summary judgment, with each side claiming that they prevail on the merits. (ECF Nos. 80, 81.) The motions have been fully briefed,[1] a complete Administrative Record with over 223,000 pages of documents that Defendants considered while drafting the Relocation EIS and SEIS has been submitted to the Court, and the Court heard argument on August 9, 2018.

For the reasons articulated below, the Court finds that the relocation efforts and proposed range and training areas in Tinian and Pagan are not "connected actions." Further, the Court finds that the proposed range and training areas may have cumulative impacts that should be assessed in a single

---

[1] Plaintiffs' Mot. for Summary J., ECF No. 80; Defendants' Resp. Br., ECF No. 82; Plaintiffs' Reply Br., ECF No. 89; Defendants' Mot. for Summary J., ECF No. 81; Plaintiffs' Resp. Br., ECF No. 83; Defendants' Reply Br., ECF No. 88.

environmental impact statement. However, rather than require Defendants to reopen the environmental impact statements related to the relocation efforts, Defendants may address any cumulative impacts in the environmental impact statement for the proposed range and training areas on Tinian and Pagan. Thus, the Court concludes that Defendants did not violate NEPA when preparing the final environmental impact statement and supplemental environmental impact statement for the relocation of Marines to Guam. Accordingly, Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED.

## II.    BACKGROUND

Plaintiffs challenge two final agency actions, the 2010 Guam and CNMI Military Relocation Final Environmental Impact Statement ("Relocation Final EIS"), memorialized in the 2010 Record of Decision, and the 2015 Supplemental Environmental Impact Statement ("SEIS"), which was memorialized in a 2015 Record of Decision. Plaintiffs contend that the environmental impacts of the Navy's proposal to create range and training areas on Tinian and Pagan should have also been included in the Relocation Final EIS and SEIS. The proposed range and training areas have been analyzed in a draft environmental impact statement, titled the Commonwealth of the Northern Mariana Islands Joint Military Training Environmental Impact Statement/Overseas Environmental Impact Statement ("CJMT Draft EIS"). The CJMT Draft EIS is not finalized and is currently undergoing revision.

The timeline of events leading to the Relocation Final EIS and SEIS and the CJMT Draft EIS is not in dispute. Instead, the parties disagree about whether the chronology and the positions taken by the relevant actors reveal that the Relocation and CJMT actions are "connected," and whether the

Relocation Final EIS and SEIS should have included an analysis of cumulative impacts resulting from the proposed range and training areas on Tinian and Pagan.

## A. Factual Background[2]

### *Process Leading to the Relocation Final EIS*

In 2002, the United States began Defense Policy Review Initiative ("DPRI") discussions with the Government of Japan to accomplish the Integrated Global Presence and Basing Strategy ("IGPBS") with regard to U.S. forces stationed in Japan. (Relocation Final EIS vol. 1 at 1-18, GUAMREL00090703.) The DPRI "focused on alliance transformations at the strategic and operational levels" and also was "designed to relieve stresses in the relationship with Japan while strengthening deterrence and global flexibility." (*Id.*) The United States and Japan "prioritized reductions in the U.S. presence in Okinawa that could ameliorate longstanding frustrations among the local population and improve the local political support for the stable and enduring presence of the remaining U.S. forces." (*Id.*)

These talks ultimately led to the signing of the 2005 U.S.-Japan Alliance: Transformation and Realignment for the Future, known as the Alliance Transformation and Realignment Agreement ("ATARA"), in which the United States and Japan "reached an understanding on common strategic objectives." (2005 ATARA, GUAMREL00004296.) These common objectives included enhancing bilateral security and defense cooperation by, among other things, expanding bilateral training through

---

[2] In preparing the Decision and Order, the Court has considered the exhibits submitted by the parties as well as the entire Administrative Record. However, as previously ordered, Plaintiffs' Exhibit 89 (ECF No. 83-15) was stricken as extra-record evidence.

"increasing mutual use of U.S. and [Japan's Self-Defense Forces] SDF training facilities and areas throughout Japan," and training in "Guam, Alaska, Hawaii, and the U.S. mainland." (*Id*. at GUAMREL00004301.) Further, the United States indicated that it intended to "expand its training infrastructure in Guam" to allow for additional training opportunities for U.S. forces and the Japanese SDF. (*Id*.) Another common objective was force realignment. (*Id*. at GUAMREL00004304.) Pursuant to this objective and the "strong request from residents of Okinawa for early return of Marine Corps Air Station (MCAS) Futenma" to local control, the United States agreed to a "redistribution of [Marine Corps] among Hawaii, Guam, and Okinawa." (*Id*. at GUAMREL00004305.) Specifically, the United States agreed to move the "headquarters of the III Marine Expeditionary Force (III MEF) . . . to Guam and other locations" with the "remaining Marine units in Okinawa" to be "realigned and reduced into a Marine Expeditionary Brigade (MEB)."[3] (*Id*. at GUAMREL00004307.)

These objectives were memorialized in greater detail in the 2006 U.S.-Japan Roadmap for Realignment Implementation. In this document, the United States committed to "relocating approximately 8,000 III Marine Expeditionary Force personnel and 9,000 dependents from Okinawa to Guam with a target completion date of 2014." (Relocation Final EIS vol. 1 at 1-19, GUAMREL00090704.) In exchange, Japan "agreed to a cost-sharing arrangement with the U.S. that would assist in funding up to $6.09 billion of the facilities construction costs for the relocation of the Marines." (*Id*.)

---

[3] A Marine Expeditionary Force (MEF) is the largest MAGTF group, and is comprised of a MEF Headquarters Group, Marine Division, Marine Air Wing and Marine Logistics Group. (Final EIS at 4-4, GUAMREL00090597.)

Following the issuance of the Roadmap, the U.S. Department of Defense ("DoD") ordered the Department of the Navy to "immediately establish a Joint Guam Program Office (JGPO) to facilitate, manage, and execute requirements associated with the rebasing of Marine Corps assets from Okinawa to Guam and implementation of the Defense Base Realignment and Closure decision to establish a Joint Base on Guam." (Aug. 25, 2006 Mem. Estab. JGPO, GUAMREL00019751.) In this role, the JGPO was limited to leading "the coordinated planning efforts among the DoD Components and other stakeholders to consolidate, optimize, and integrate the existing DoD infrastructure capabilities on Guam." (*Id*.) The programming and budgeting roles would remain with the DoD components (e.g., Department of the Navy), and U.S. Pacific Command would independently "identify required capabilities and direct the flow of forces for the rebasing effort to ensure required readiness of forces is maintained." (*Id*.)

After JGPO was established, Assistant Secretary of the Navy for Installations and Environment B.J. Penn requested that the Marines create a list of the units that would be relocated and their requirements. (Aug. 17, 2006 Mem., GUAMREL00004404.) In a response memo dated September 14, 2006, the Assistant Commandant of the Marine Corps indicated that the 8,552 personnel being relocated to Guam fell into four groups of permanently stationed units: command element, ground combat element, aviation combat element, and combat service support. (Sept. 14, 2006 Mem., GUAMREL00017611–12.) The memo also indicated that approximately 1,200 transient units were expected to visit and train on Guam, as well as other "visiting units from USMC, DoD, and Allied countries." (*Id*. at GUAMREL00017613.)

With regard to "Training Requirements on Guam," the response memo identified training and facility usage and locations for individual combat skills, small arms, communications, small unit patrolling and maneuver, crew served weapons, MOUT (urban warfare), convoy ops, demolition ops, equipment operator training/practice, obstacles/breaching, bridging, landing beach, and NSWU-1 CQC/Breacher House. (*Id*. at GUAMREL00017620–21.) Further, the memo listed "Potential Off-Island Training Requirements," identifying "notional" facilities for Tinian, Aguian [*sic*], Saipan, FDM, Sarigan, Rota, and Pagan. (*Id*. at GUAMREL00017621–25.) Of relevance here is the requested use of Tinian for maneuver and tactical ops and mechanized ground (tanks, AAV/EFV) training (*id*. at GUAMREL00017621), and requested use of Pagan for an EW (portable) staging site; STOM sea, land, subsurface areas; combined arms; and amphibious assault to be used by Marine Air-Ground Task Force ("MAGTF") units.[4] (*Id*. at GUAMREL00017624–25.) The memo noted, however, that training range requirements would be "reduced when training [was] available in deployed locations (e.g., Australia, Philippines, etc.)." (*Id*. at GUAMREL00017625.)

Upon receiving this information, JGPO began the process of determining the appropriate scope of the environmental impact statement ("EIS") that would be required to implement the Roadmap. On March 7, 2007, the Department of the Navy published its Notice of Intent to Prepare an Environmental Impact Statement/Overseas Environmental Impact Statement for the Relocation of U.S. Marine Corps Forces to Guam. (Mar. 7, 2007 NOI, GUAMREL00004747–48.) In the Notice of Intent, the Navy indicated that the proposed action was "required to maintain the [Department of the Navy's] capability

---

[4] Marine Air-Ground Task Force (MAGTF) is "how the Marine corps is set up to perform all types of their military actions. It insures that ground forces and air forces are working together under single leadership and a clear goal." (Final EIS at 4-4, GUAMREL00090597.)

to accomplish its mission in this critical geographic region in support of the U.S./Japan Alliance and consistent with the DoD Integrated Global Positioning and Basing Strategy and Quadrennial Defense Review." (*Id.* at GUAMREL00004747.) Different actions and their environmental consequences would be evaluated to accommodate the relocating Marines, including "training areas on Guam and other locations within the Mariana Islands." (*Id.*) This Notice led to an ongoing internal debate between JGPO and the U.S. Marine Corps about what must be included in the EIS.

### *Marine Corps Position*

The Assistant Commandant repeatedly represented to JGPO and the Assistant Secretary of the Navy that all of the training ranges identified in the September 2006 memorandum were required per the "Western Pacific Alignment Plan as augmented by MARFORPAC [Marine Forces Pacific] training concept plan (TCP) and future force adjustments from the President's Grow the Force decision." (Jan. 18, 2008 Mem., GUAMREL00011827; *see also* Nov. 2007 Mem., GUAMREL00010793–808 (noting the baseline for Marine Corps force structure was the Western Pacific Alignment Plan of November 2006, and this required full MAGTF training capabilities in Guam and the CNMI).)

However, as an alternative, at the direction of the Commandant of the Marine Corps, the training facilities were segmented into what the Marine Corps believed were (1) "minimum acceptable requirements for near-term" that needed to be included in the Relocation EIS, and (2) longer-term needs that could be analyzed in a separate EIS. (May 29, 2008 Ranges and Training Area Mgmt. Presentation, GUAMREL00015050.) The Tier I or Phase I priorities included KD small arms ranges, an MG range, individual combat skills, mortars/artillery, VOA relocation, multi-purpose range, and

aviation landing. (*Id*. at GUAMREL00015055; *see also* Training Concept Plan Phase I, GUAMREL00014716.)

### *JGPO Position*

As the planning for the Relocation EIS continued, Assistant Secretary of the Navy Penn met with members of the Guam Executive Council of the JGPO, including representatives of the U.S. Marine Corps, to discuss the scope of the EIS, and the Council agreed that it should include "all requirements set forth in the applicable Agreement Implementation Plan [AIP]," and account for the presence of 2,000 transient personnel. (Aug. 26, 2008 Mem., GUAMREL00017588.) They further concluded that the facilities necessary to support the transient forces should be "comparable to existing facilities support on Okinawa." (*Id*.) Finally, the Council noted that funding "for non-AIP structure is not included in [the] Defense Policy Review Initiative (DPRI) cost estimate." (*Id*.)

JGPO confirmed that the Secretary of Defense instructed it to limit the "planning activities for the relocation" of Marines to Guam to what those forces needed, "with planning for future growth or additional capabilities included only where it does not have a material impact to cost, schedule, environmental planning, or natural resource consultation matters affecting AIP implementation." (Sept. 9, 2008 email, GUAMREL00019240.) Faced with planning the EIS around the "AIP force structure, its associated training requirements" and the deadline of January 2010, JGPO determined that the EIS "cannot encompass all of the long-term training and training facilities development objectives identified in the [USMC] Training Concept Plan." (*Id*.) Moreover, Japan was supposed to fund some of the bilateral training capabilities but was "resist[ing] signing up for anything near-term."

(*Id.* at GUAMREL00019241.)  Thus, JGPO wanted to adopt a "priority based approached [*sic*] to planning for training and training facilities development, particularly on Tinian."  (*Id.*)

As the Director of JGPO further explained in November 2008, based on the guidance received regarding implementation of the Roadmap and the input from the Assistant Commandant of the Marine Corps (ACMC) with regard to training needs, the ranges and facilities were divided into "must do" and "might be able to do," and the EIS was limited further by what JGPO was "required to do by [its] charter."  (Nov. 24, 2008 email, GUAMREL00019728.)

First, the JGPO charter limited the project to "requirements associated with the rebasing of Marine Corps assets" and did not provide "authority to assume the mantle of planning for meeting the training requirements of the Marine Corps across the Pacific."  (*Id.*)  Second, based on the force list and range requirement list for Guam that the ACMC had provided on September 14, 2006, the EIS was limited to the "weapons that are organic to those units," and the off-island training requirements "identified as 'notional' requirements for units outside of those relocating to Guam under the" Roadmap were therefore "beyond the scope of what JGPO is chartered to accomplish."  (*Id.*)  Third, U.S. Pacific Command identified the "capability and training requirements for forces expected to be based on Guam," and specified that certain ranges were necessary for those being relocated from Okinawa and other training ranges to be created in the CNMI were for forces not included in the Roadmap.  (*Id.* at GUAMREL00019728.)  Thus, the additional ranges in the CNMI fell outside of the scope of the JGPO charter.  (*Id.*)  Additionally, JGPO reviewed the ACMC's list of requested training ranges and found that a number of them were not connected to a specific force being relocated from Okinawa to Guam, and were not necessary for the forces moving to Guam.  (*Id.* at

GUAMREL00019730.)   JGPO also noted that the facilities planning for transient forces was limited to the "bed-down" facilities, but do not include ranges. (*Id*.)

Finally, JGPO reiterated that range requirements are limited to those required by the AIP forces, which are "only direct fire organic weapons." (*Id*.)   Separately, JGPO agreed to "look for opportunities to include indirect fire weapons (mortars and artillery)," but because the weapons "organic" to the relocating forces included only direct fire weapons, the indirect weapons would be included only if they did not "jeopardize/stop/delay training/environmental planning."  (Aug. 16, 2008 email, GUAMREL00017609-10.)  Indirect fire weapons that would further delay the Relocation EIS would be reconsidered in Phase II with a separate EIS.  (*Id*.)

In December 2008, the JGPO released its decision regarding the scope of the EIS, concluding that it would cover only training ranges that "support the individual and small unit training requirements." (Dec. 10, 2008 Mem., GUAMREL00020011.)  Additional training requirements were "beyond the scope of the Program established by the referenced" implementation plans for the relocation, and thus, any "[t]raining for U.S. Army and U.S. Navy forces relocating to Guam will be conducted at off-site locations or on already-existing ranges in Guam and CNMI." (*Id*.)  To rebase the Marines, particularly the III Marine Expeditionary Force, the JGPO listed eleven separate functional areas that would be needed for training requirements, and listed the types of training ranges or facilities that would be needed to meet those requirements.  (*Id*. at GUAMREL00020013–17.) These included multiple rifle and pistol known-distance and unknown-distance ranges; small arms indoor range; grenade launcher range; live hand grenade range; light antiarmor weapons range (live fire); and an automated multi-purpose machine gun range.  (*Id*. at GUAMREL00020016.)

*Decision by the Secretary of the Navy*

In January 2009, JGPO and the ACMC briefed the Secretary of the Navy as to their respective positions. The Marine Corps indicated that if "training is limited to the ranges covered by current EIS, combat readiness will be degraded," Title 10 training requirements would not be met, and the goal of the Roadmap with respect to expansion of bilateral training would not be met. (USMC Briefing to SECNAV, GUAMREL00020514–15.) Further, without full capabilities, the Marines would lose training that "currently exists in Okinawa." (*Id*. at GUAMREL00020515.) Finally, the costs of a separate EIS for full range training areas on Tinian and Pagan would be incurred entirely by the Marine Corps. (*Id*. at GUAMREL00020517.) In noting that the Marine Corps preferred to incorporate a full site-specific study of Tinian and Pagan in the Relocation EIS, they also conceded that the delay to the Record of Decision was "politically unacceptable." (*Id*. at GUAMREL00020518.) In a chart, the Marine Corps also compared the core competency training capabilities on Japan, on Guam only, and on the combined areas of Guam, Tinian, and Pagan, to demonstrate that the latter provided the most comprehensive training capabilities. (Jan. 2009 Presentation for Sec'y of the Navy 12, GUAMREL00220445.)

The Secretary of the Navy declined to revise the JGPO's proposed scope for the EIS, indicating that the Marine Corps' concerns about training capabilities were "part of a much larger set of DoD issues that will be addressed in [the] forthcoming QDR [Quadrennial Defense Review]." (Jan. 22, 2009 email, GUAMREL00220428.) More precisely, the Secretary concluded that "what is needed now is a more holistic assessment relevant to force posture and laydown the Pacific," and thus, before a decision about full-training capabilities for the Marine Corps could be made, the agencies "have to

look at the entire DOD laydown in the Pacific, and for that matter in Europe, and elsewhere US Forces are OCONUS [outside of the continental United States]." (Jan. 25, 2009 email, GUAMREL00220429.) To proceed otherwise could result in "a series of 'knee jerk' decisions that may not be necessarily tied together or be complimentary with long term US Strategy." (*Id*.) Moreover, following the 2008 presidential election, he noted that "[a]s a result of the new Administration taking office, just about everything will be revisited." (*Id*.) Thus, the Secretary concluded that the best way to assess the Marine Corps' concerns was to address everything in the 2010 Quadrennial Defense Review, which would give the Department of Defense an opportunity to review the "OCONUS force laydown as a result of the overseas strategy." (*Id*.) As further described by the JGPO, the Department of Defense, since 1999, had been developing training infrastructure in the CNMI, and the "planning for future training venues is being conducted by multiple DoD organizations and can be roughly divided into three categories – training conducted within the Mariana Island Range Complex (MIRC), training related to the relocation of Marine Corps personnel from Okinawa to Guam . . ., and individual Service or Joint training concept plans in the Western Pacific region." (CNMI Joint Military Training Master Plan Overview (Jan. 2009), GUAMREL00220398.)

The scope of the project, including the number of Marines to be relocated to Guam and the cost-sharing agreement with Japan, was reaffirmed in the 2009 Guam Implementation Agreement between the two nations and in the 2010 Quadrennial Defense Review. (Final EIS vol. 1 at 1-20, GUAMREL00090705.)

//

/

### *Relocation Final EIS*

With the scope of the EIS decided, Defendants undertook the procedures to create a complete EIS for the relocation projects. In July 2010, the Relocation Final EIS was issued.

Within the document, a number of actions were proposed to accommodate the relocation of 8,552 Marines and 630 Army permanent personnel. (Relocation Final EIS vol. 1 at 2-2, GUAMREL00090735.) The details of the actions were prefaced with a statement of purpose: "The overarching purpose for the proposed actions is to locate U.S. military forces to meet international agreement and treaty requirements and to fulfill U.S. national security policy requirements to provide mutual defense, deter aggression, and dissuade coercion in the Western Pacific region." (Relocation Final EIS vol. 1 at 1-15, GUAMREL00090700.)

The proposed actions of relevance to this case are the training ranges and facilities for the Marines. First, a live-fire training range complex was proposed for Guam to meet individual and military occupational specialty training, small unit training up to company level, and MAGTF multi-dimensional fire and maneuver training. (Final EIS vol. 2 at 2-41, GUAMREL00090970.) Thus, the complex would provide training in ammunition storage; command, control, and simulation; non-firing general military skills; firing general military skills; aviation; and airspace. (*Id.*)

Next, four live-fire training ranges were proposed for Tinian: Rifle known distance (KD) range, Automated Combat Pistol/Military Police Firearms Qualification Course, Platoon Battle Course, and Field Firing Range. (Final EIS vol. 1 at 2-18, GUAMREL00090751.) Under the proposal for Tinian, the training ranges would "support individual up to company level sustainment training," and the ground elements "would enable three of the four components of the Marine Air Ground Task

14

Force (Command, Ground, Air, and Logistics) to accomplish weapons training tasks." (Final EIS vol. 3 at 1-6, GUAMREL00092411.)

Marine Corps training consists of three phases known as "crawl, walk, and run." (2010 ROD, GUAMREL00108407.) The first phase consists of "individual combat skills," the second includes "small unit movement, crew served weapons training, and unit or team specialty training," and the third involves working as an "operational unit, such as an infantry battalion or aviation squadron." (*Id*. at GUAMREL00108407–8.)

By proposing different types of training facilities on Guam and Tinian, the Final EIS intended to create more "individual and crew weapons qualification and familiarization training ranges, maneuver areas, and aviation training" on Guam, and the "next stage in training"—small unit weapons training—for Tinian. (Final EIS vol. 1 at 2-18, GUAMREL00090751.) However, the Final EIS recognized that the planned ranges "only replicate existing individual-skills training capabilities on Okinawa and do not provide for all requisite collective, combined arms, live, and maneuver training the Marine Corps must meet to sustain core competencies." (*Id*. at GUAMREL00090750.) Thus, "[a]s with Marine Corps forces currently in Okinawa who must now travel to mainland Japan, other partner nations, and the United States to accomplish this requisite core competency training, the Marine Corps relocating from Okinawa to Guam would also have to use alternate locations to accomplish requisite core competency training." (*Id*.) The remaining unmet training needs for "higher level integrated core competency training" and the "suitability of CNMI to meet" these needs were, however, separately "evaluated during the 2010 QDR process," and recommendations from this process would be assessed in separate environmental impact statements. (*Id*.)

### *2010 Record of Decision*

Based on the contents of the Relocation Final EIS, the Navy and Army "announced their decision to proceed with Guam and Commonwealth of Northern Mariana Islands (CNMI) Military Relocation" in a Record of Decision released in September 2010. (2010 ROD, GUAMREL00108285.)

The reasons given for the relocation mirrored the statements of purpose in the Final EIS (*see id*. at GUAMREL00108292–93), and based on these objectives, the Departments of Defense and the Navy indicated that, with respect to training, they were deferring a final decision on Guam and were going to implement four training ranges on Tinian. (*Id*. at GUAMREL00108288–89.) Specifically, the military, having concluded that not all training could be done on a single island, decided that it would use land on Tinian that was already leased by the military to develop "limited live fire training ranges capable of handling small unit combat skills training." (*Id*. at GUAMREL00108294.) Due to the proposed four live-fire training ranges and existing non-live-fire training areas, there was no space to also create a range for individual combat skills training. (*Id*.) Thus, the individual combat skills training would need to be carried out on Guam. (*Id*.) However, a decision on where to locate a live-fire individual combat skills training complex on Guam was deferred because the requisite analysis under the National Historic Preservation Act was not complete, and therefore the Navy could not adequately assess whether its preferred location near Route 15 would be feasible. (*Id*. at GUAMREL00108288, GUAMREL00108301.)

//

/

### *Amendments to Final EIS and Preparation of Supplemental EIS*

After the 2010 Final EIS was released, the Department of the Navy concluded its study on Guam under the National Historic Preservation Act, committed to "conduct training activities in such a manner that would not impact access to Pagat Village and Cave via the existing trail," and issued a Notice of Intent ("NOI") to create a supplemental EIS ("SEIS") to the Relocation Final EIS that would focus on developing a live-fire training complex on Guam. (Feb. 9, 2012 NOI, GUAMREL113200–01.) The Navy stressed that failing to provide these facilities would not allow the Marines to meet Title 10 training requirements or "satisfy individual live-fire training requirements as described" in the Relocation Final EIS. (*Id.*at GUAMREL00113201.)

While the SEIS was being prepared, the Governments of the United States and Japan altered the 2006 Roadmap, first announcing the intended changes in a Joint Statement released on April 27, 2012, and then by formally amending the Roadmap in a Protocol signed on October 3, 2013. (2013 Protocol, GUAMREL196310–13.) The 2012 Statement and Protocol reduced the number of individuals relocating from Okinawa to Guam to 5,000 Marines and approximately 1,300 dependents. (Oct. 11, 2012 NOI, GUAMREL00115335.) To account for the reduced forces and dependents on Guam, the Navy issued another NOI to amend the scope of the SEIS. (*Id.*)

### *Creation of CJMT Draft EIS*

Several months after the Navy indicated it was amending the scope of the SEIS for the Relocation Final EIS, on March 14, 2013, the Navy announced its Notice of Intent to prepare the Commonwealth of the Northern Mariana Islands Joint Military Training Environmental Impact Statement/Overseas Environmental Impact Statement ("CJMT EIS"). (Mar. 14, 2013 NOI,

GUAMREL00222082–84.)  In the Notice, the Navy proposed to create range and training areas within the CNMI to address "unfilled unit level and combined level military training requirements in the Western Pacific."  (*Id*. at GUAMREL00222082.)  The range and training areas ("RTAs") would be "available to U.S. forces and their allies on a continuous and uninterrupted schedule."  (*Id*.)  This need for "joint service training" was identified by U.S. Pacific Command in multiple documents and studies, and these studies further identified the Mariana Islands as (1) the "prime location to support forces" throughout the Pacific Command Area of Responsibility, and (2) the region having the "greatest number of training deficiencies."  (*Id*. at GUAMREL00222083.)  Thus, the Navy proposed to create an RTA on Tinian and one on Pagan to support joint training needs.  (*Id*.)  If the proposals did not go forward, the 2010 decision to create four live-fire training ranges on Tinian would then be implemented.  (*Id*.)

The CJMT Draft EIS was released in April 2015, and discussed in further detail the need for joint services training.  (GUAMREL 00222085.) In particular, the Quadrennial Defense Reviews from 2010 and 2014 concluded that the "emerging security landscape [in the Western Pacific] requires a more widely distributed presence in Asia" and justified moving 60 percent of the Navy's assets to the Pacific by 2020, which would inevitably require additional, advanced training opportunities.  (*Id*. at GUAMREL00222233, GUAMREL00222235.)

The RTAs proposed would consist of "live-fire ranges, training courses, maneuver areas, and associated support facilities."  (*Id*. at GUAMREL00222120.)  Further, the RTAs were designed to allow all U.S. forces—whether in the Marine Corps, Navy, Air Force, or Army—in the Pacific Command Area of Responsibility to meet the Title 10 training requirements.  (*Id*. at

GUAMREL00222112.)  To that end, the RTA on Tinian would fulfill unit-level training needs while the RTA on Pagan would fulfill combined level training needs.  (*Id*. at GUAMREL00222114.)

Four range complexes were proposed for Tinian: Range Complex A, for a High Hazard Impact Area where live-fire high explosives from activities including hand grenades, grenade launchers, and live munitions from machine guns and rockets could be used; Range Complex B, where live-fire vehicle-mounted training would occur (i.e., firing at stationary and moving targets); Range Complex C, where live-fire associated with the infantry platoon battle course and urban assault course would occur; and Range Complex D, for aviation and ground training.  (*Id*. at GUAMREL00222123–24.) Other operations included a field artillery indirect fire range, a convoy course, tactical amphibious landing beach training, two maneuver areas, a landing zone, and airfield training.  (*Id*. at GUAMREL00222124.)  The no-action alternative was to implement the four, more limited training ranges studied in the 2010 Relocation Final EIS.  (*Id*. at GUAMREL00222125)

Two training range complexes were proposed for Pagan, a North Range Complex and a South Range Complex.  (*Id*. at GUAMREL00222148–49.)  In the North Range Complex, there would be a High Hazard Impact Area for ground, air, and naval surface fire support live-fire and inert munitions, and also several maneuver areas for patrolling, firing live-fire weapons, and integrating supporting arms assets.  (*Id*.)  The South Range Complex would focus on maneuver area operations for small units of special operations personnel as well as combat swimmer training.  (*Id*. at GUAMREL00222149.)  The no-action alternative was to continue the prohibition on individuals occupying the island and limited military activity.  (*Id*.)

### *Relocation Final SEIS*

Approximately three months after the Navy released the CJMT Draft EIS, the agency published the Relocation Final SEIS.  In the Final SEIS, the Navy provided an analysis of the impacts of the "cantonment area, family housing, live-fire training range complex, and supporting infrastructure." (2015 Final SEIS at 1-1, GUAMREL00220566.)  With respect to the live-fire training range complex proposed for Guam, five alternatives were considered, all of which included a "stand-alone Hand Grenade (HG) Range at Andersen South." (*Id*. at GUAMREL00220568.)  The purpose of the proposed training range complex was to "ensure that the relocated Marines are organized, trained, and equipped as mandated by 10 USC § 5063, to satisfy individual live-fire training requirements . . . and to establish an operational Marine Corps presence on Guam in accordance with the April 2012 Roadmap Adjustment." (*Id*. at GUAMREL00220572.)  Otherwise, the "purpose remains unchanged from the 2010 Final EIS, albeit to support a materially smaller relocating Marine Corps force." (*Id*.)  The proposed live-fire training range complex included a KD rifle range; KD pistol range; non-standard small arms range; modified record of fire range; and an MPMG (multi-purpose machine gun) range that would allow for training with 5.56-mm, 7.62-mm, and 0.50-cal weapons and 40-mm inert training rounds. (*Id*. at GUAMREL00220587.)  A hand grenade range would separately be developed at Andersen South. (*Id*. at GUAMREL00220588.)

With respect to live-fire training ranges on Tinian, the Final SEIS concluded that the decision to construct them was "not affected by the 2012 Roadmap Adjustments," but because the range and training areas proposed in the CJMT Draft EIS would "supersede the 2010 ROD with regards to

Tinian," the Navy decided to defer "any implementation of the Tinian training ranges . . . pending the outcome of the CJMT EIS." (*Id.* at GUAMREL00220568.)

### *Record of Decision for Relocation Final SEIS*

On August 29, 2015, the Navy, on the basis of its findings in the Final SEIS, chose to proceed with the creation of a live-fire training range complex at the Andersen Air Force Base–Northwest Field location and the separate hand grenade range at Andersen South. (2015 ROD, GUAMREL00218720.) The purpose of the training range and relocation remained unchanged from the Relocation Final SEIS. (*See id.* at GUAMREL00218722.) The Navy indicated that the training range, cantonment, and family housing component would be implemented "over 13 years." (*Id.* at GUAMREL00218747.)

### B. Procedural Background

Plaintiffs filed the instant lawsuit in 2016, claiming (1) that the Relocation Final EIS and SEIS failed to include the "connected action" proposed in the CJMT Draft EIS, or, alternatively, failed to include an assessment of cumulative impacts resulting from proposals in the CJMT Draft EIS, and (2) that the Relocation Final EIS and SEIS violated NEPA by failing to consider alternate locations for where to station the Marines. (Compl., ECF No. 1.) Defendants moved to dismiss the complaint (ECF No. 19), and the Court granted the motion in part by dismissing the second claim. (Decision and Order, ECF No. 42.)

Subsequently, Defendants lodged the Administrative Record with the Court. (ECF No. 48, 52.) Plaintiffs moved to complete or, alternatively, supplement the Administrative Record. (ECF No. 50.) The Court granted the motion. (ECF No. 58.) Defendants moved for reconsideration (ECF No.

69), which the Court granted in part and denied in part.  (ECF No. 73.)  Consistent with these orders, Defendants filed a supplement to the Administrative Record.

Pursuant to a joint scheduling order, the parties filed cross-motions for summary judgment, each asserting that they are entitled to judgment on Plaintiffs' remaining claim.  (ECF Nos. 80, 81.) The Court heard argument from counsel and now renders its decision.

### III.    LEGAL STANDARD

A procedural challenge to an environmental impact statement is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005).  The APA instructs courts to set aside final agency actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. (quoting 5 U.S.C. § 706(2)(A)).  In the context of a challenge to an environmental impact statement, the Ninth Circuit requires district courts to use the "rule of reason" approach, and consider "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences."  *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006) (quoting *Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).  This approach is "not materially different from arbitrary and capricious review," which requires the court to ascertain whether the agency took a "hard look" at the environmental consequences.  *Id*.

Thus, a court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  If an agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," then the agency has violated the APA. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

This inquiry is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Id.* (internal quotation omitted). However, a court's review of the agency's decisionmaking process is still "searching and careful." *Ocean Advocates*, 402 F.3d at 858.

## IV. DISCUSSION

Plaintiffs and Defendants seek summary judgment on the claim that the actions contemplated in the Relocation Final EIS and SEIS and the CJMT Draft EIS must be discussed in a single EIS because they are "connected actions" or, alternatively, because the environmental consequences from the range and training areas proposed in the CJMT Draft EIS are "cumulative impacts" to the consequences identified in the Relocation Final EIS and SEIS.

NEPA requires that all federal agencies complete environmental impact statements for major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The statute does not impose "substantive environmental standards" that agencies must meet, but is an "action-forcing device" that ensures agencies will take into account how their actions affect the environment. *Kern v. Bur. of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002); 40 C.F.R. § 1502.1. Thus, all environmental impact statements must include a "full and fair discussion of

significant environmental impacts," and analyze "reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*

An agency generally has "considerable discretion in defining the scope of an EIS," but an EIS must include more than one action in a single EIS if they are connected or cumulative actions. *Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995).

Actions are connected if they –

> (i)   Automatically trigger other actions which may require environmental impact statements;
> (ii)  Cannot or will not proceed unless other actions are taken previously or simultaneously; or
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1).

Cumulative actions are those that, "when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). "Cumulative impact" means the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. These impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

**A.  Connected Actions**

Plaintiffs challenge the Relocation Final EIS and SEIS as procedurally deficient because these documents do not analyze the allegedly "connected action" of the proposed range and training areas ("RTAs") on Tinian and Pagan from the CJMT Draft EIS. (*See generally* Pls. Mem. in Supp. of Mot.,

ECF No. 80-1.) Specifically, Plaintiffs contend that Defendants knew that the relocating Marine Corps needed all levels of MAGTF training, that the CNMI was the only place for the Marines to receive all required training, that the Marines were the only force with significant need for training in the CNMI, and that the Marines insisted on having all training facilities available before relocating. (*Id.* at 27–33.) Defendants' decision to include only some of the MAGTF training requirements in the Relocation EIS was therefore irrational. (*Id.* at 27.) Moreover, given that the Marines were, according to Plaintiffs, the only force with a significant need for training on Tinian and Pagan, those facilities would not be built without the Marines, demonstrating that the actions are connected. (*Id.* at 31.)

Defendants, by contrast, contend that the decision to limit the scope of the Relocation EIS to some parts of the MAGTF training was a rational choice given that (1) the United States committed to removing a significant number of Marines from Okinawa as soon as possible, and (2) the CJMT proposals for Tinian and Pagan were developed to accommodate the training needs of all of the U.S. and allied forces stationed in or transiting through the Pacific Command Area of Responsibility. (Defs. Mot. at 27–32.)

The Ninth Circuit uses an "independent utility" test to determine whether multiple actions are connected. *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir. 2015). The inquiry requires a court to determine whether "each of two projects would have taken place with or without the other and thus had independent utility." *Id.* (internal emphasis omitted). A court must analyze each project as part of the inquiry. *Id.* (stating the Ninth Circuit has "extended our analysis to each project").

Applying the Ninth Circuit's test, and having considered the arguments of the parties and reviewed the Record, the Court concludes that the actions have independent utility and therefore grants summary judgment on this issue to Defendants. As set forth above, Defendants maintain that the actions proposed in the Relocation EIS have independent utility from the actions proposed in the CJMT EIS because they are driven by and implement different diplomatic, international, and military concerns. The Court agrees.

First, to determine whether the relocation of Marines to Guam can take place without the RTAs proposed for Tinian and Pagan in the CJMT Draft EIS, the Court considers the objectives of each EIS. From the outset, with regard to the relocation of Marines to Guam, at least one purpose of the proposed actions has been to reduce the number of Marines in Okinawa to "ameliorate longstanding frustrations among the local population." (Relocation Final EIS vol. 1 at 1-18, GUAMREL00090703.) The relocation, however, was also considered by the Departments of the Navy and Defense in the context of broader military strategies and initiatives, particularly the Defense Policy Review Initiative (DPRI) and Integrated Global Presence and Basing Strategy (IGPBS), to ensure that the Marines being removed from Okinawa would be placed in a strategically beneficial location that satisfied the Department of Defense's decision to move U.S. forces to "locations that are optimized to support current allies and confront new potential threats." (*See id.* at GUAMREL00090702.)

By contrast, the CJMT Draft EIS was created to "reduce joint training deficiencies for military services in the Western Pacific." (CJMT Draft EIS at ES-4, GUAMREL00222112.) The Western Pacific "stretches over a vast area, from China in the north and west, to New Zealand in the south, and French Polynesia in the east." (*Id*. at 1-1, GUAMREL00222225.) Tinian and Pagan were selected as

26

the ideal sites for the proposed actions because studies indicated the worst deficiencies were in the Marianas region, and because the location would be able to "support ongoing operational requirements, changes to U.S. force structure, geographic repositioning of forces, and U.S. training relationships with allied nations." (*Id*. at ES-4, GUAMREL00222112.)

From these descriptions alone, the Court concludes that the Relocation EIS clearly has an independent objective: fulfillment of a commitment to Japan to remove Marines from Okinawa as a means of eliminating or minimizing friction between the United States and Japan. Additionally, the Court concludes that the CJMT proposals for Tinian and Pagan have an objective independent of the Relocation EIS: provision of joint service training for all U.S. forces—whether Marines, Army, Air Force, or Navy—as well as allied forces in a strategically central area in the Pacific.

Next, the Court has considered the Administrative Record to determine whether it would be rational for one of the proposals to go forward without the other. Plaintiffs contend that the relocation of Marines cannot rationally go forward—even in phases subject to separate environmental impact statement analyses—without the creation of all of the proposed training facilities on Guam, Tinian, and Pagan because, otherwise, the Marine Corps will be unable to meet all MAGTF or Title 10 training requirements. The Administrative Record does not support this perspective.

As an initial matter, the parties do not dispute that Marine Corps units require MAGTF training to be combat-ready. However, the September 2006 memorandum from the Assistant Commandant for the Marine Corps and attached list of training needs do not demonstrate that all MAGTF training must be done on Tinian and Pagan, or even in the CNMI. The Assistant Commandant's list of training facilities expressly states that they are "notional." (*See* GUAMREL00017620–25.) In other words,

they are suggestions for facilities that would help the Marine Corps meet their Title 10 and MAGTF requirements; they are not facilities that must be constructed before the Marines can be relocated.

To the contrary, the Marine Corps ultimately created a tiered or phased list of training needs with Tier I or Phase I requirements being the list of facilities that needed to be complete or available on Guam or in the CNMI by the time they were rebased on Guam. (*See* May 29, 2006 Ranges and Training Area Mgmt. Presentation, GUAMREL00015050; *id*. at GUAMREL00015055 (listing Tier I facilities); Training Concept Plan Phase I, GUAMREL00014716 (creating Phase I and Phase II training facilities).) Moreover, the Record is replete with indications that Marine Corps units routinely need to travel to receive all MAGTF and Title 10 training. For example, Plaintiffs' Exhibit 8 (ECF No. 80-10) includes a chart comparing the training capabilities at existing Marine Corps bases, and reveals that only one base, Camp Pendleton, has all of the capabilities on-site. (GUAMREL00011164.) Moreover, as described above, the Navy and Department of Defense have never denied that the relocated Marines need all required training, but have maintained that, as when they were stationed at Okinawa, they would need to travel to other locations to receive that training. (*See, e.g.*, Dec. 10, 2008 Mem., GUAMREL00020011.) The Relocation Final EIS further specifies that Marines currently travel from Okinawa to other places in Japan, to the U.S. mainland, and other nations to complete all training requirements. (Final EIS vol. 1 at 2-17, GUAMREL00090750.)

Therefore, the Court concludes that the Record does not support a finding that all of the individual combat skills, small unit-based, and operational unit or joint services training must be provided in one location, or even in close proximity to the Marine Corps base. Having all facilities near the base may be convenient, but the Record does not demonstrate that Defendants unreasonably

concluded that the relocated Marines could continue traveling to complete all of their training needs.

Similarly, the Court finds no merit to Plaintiffs' contention that the CJMT projects cannot go forward without the Marines being relocated to Guam. Even if the Marines may be significant users of the proposed training facilities on Tinian and Pagan, nothing in the Record suggests that the Navy or Department of Defense thought the training ranges could not go forward absent those 5,000 Marines. Plaintiffs submit that, because the Marines would use the ranges in far greater numbers than the Army, the CJMT would be irrational without their presence on Guam. (*See* Mem. in Supp. 36–37.) Even assuming that the Marines would use the facilities more than the Army, the CJMT Draft EIS makes clear that the training ranges would be used by all U.S. forces and other nations. (CJMT Draft EIS at 2-6, GUAMREL00222258.) Moreover, although there are differences in command and training structure, "many military occupational specialties are similar in regard to the types of training being conducted." (*Id.*) For example, "ground-based (Army), sea-to-land (Navy) and air-to-ground (Air Force) forces need similar training as Marine Corps ground-, sea-, and air-based units." (*Id.*) Thus, Plaintiffs' contention is pure speculation and unsupported by the Record.

In short, the Court concludes that the Relocation EIS serves the independent purpose of fulfilling international obligations to Japan, and the CJMT EIS serves the independent purpose of evaluating the training facilities required—both type, size, and resulting impacts—not just for the Marine Corps, but for all U.S. forces stationed in or training in the Pacific. The most direct summation of this position appears in two emails describing the Secretary of the Navy's position. As described above, the JGPO and Marine Corps had an opportunity to brief the Secretary as to their respective positions in January 2009, and the Secretary determined that the Relocation EIS need not include all

of the training that the Marine Corps requested because the full scope was "part of a much larger set of DoD issues that will be addressed in [the] forthcoming QDR [Quadrennial Defense Review]." (Jan. 22, 2009 email, GUAMREL00220428.)  To attempt to create all of the Marine Corps' training needs within the Relocation EIS was not, in the Secretary's view, the best approach because "what is needed now is a more holistic assessment relevant to force posture and laydown the Pacific."  (Jan. 25, 2009 email, GUAMREL00220429.)

In other words, the advanced training ranges sought by the Marines needed to take into account the needs of all the U.S. and allied forces that would be using the ranges, not just the relocated Marines, and thus, the agencies needed "to look at the entire DOD laydown in the Pacific, and for that matter in Europe, and elsewhere US Forces are OCONUS [outside of the continental United States]."  (*Id.*)  Without this broader review, addressing the Marine Corps' notional needs might result in "a series of 'knee jerk' decisions that may not be necessarily tied together or be complimentary with long term US Strategy."  (*Id.*)

Plaintiffs' comparisons to the Ninth Circuit cases of *Thomas v. Peterson* and *Shoshone-Paiute Tribe v. United States* are unavailing.  In *Thomas*, the U.S. Forest Service prepared an environmental assessment (EA) on whether building a road to facilitate the removal of timber to be sold would have a significant environmental impact and therefore require the Service to complete an EIS.  753 F.2d 754, 756 (9th Cir. 1985).  The Service concluded that the construction of a road would not have a significant environmental impact and declined to complete an EIS.  *Id.*  Plaintiffs sued, arguing that the Service should have assessed the effects of the anticipated timber sales in the same EA.  *Id.*  The Ninth Circuit concluded that the construction of the road and the timber sales were connected actions

because neither would proceed without the other—the road was needed to remove the timber, and the timber sales could not be completed without the road. *Id*. at 761. Even though the timber sales were not entirely planned, the planning was at an "advanced stage" by the time the Service had decided to build a road, and the analysis of the sales was done "contemporaneously" with the plan for building the road. *Id*. at 760–61. Thus, the road and timber sales were connected actions that should have been completed in a single EA. *Id*.

The process leading to the Relocation EIS and CJMT Draft EIS is not analogous to that in *Thomas*. Certainly, the national security and defense goals of the Guam relocation and CJMT proposals are "overlapping," but they are not "co-extensive." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1098 (9th Cir. 2012). In this case, the U.S. Department of State negotiated the 2006 Roadmap and the Department of Defense then created the Relocation EIS to implement the various facets of the Roadmap, including rebasing the Marine Corps. Although improved opportunities for bilateral training between Japan and the U.S. forces was contemplated, no details were provided and the generic reference to improved training therefore did not mandate the creation of the training ranges on Tinian and Pagan that the CJMT Draft EIS proposed. Similarly, the RTAs proposed in the CJMT Draft EIS serve more than the Marines, and are therefore not comparable to the road in *Thomas* that was created only to facilitate the removal of timber. That said, as in *Thomas*, the Navy was internally discussing the possibility of expanding training ranges in the CNMI while also drafting the Relocation EIS. However, the Court cannot find that it was irrational for Defendants to decide to evaluate the training ranges in a separate EIS to ensure that the proposal would accommodate the needs and adequately assess the environmental impacts of all of the U.S. and allied forces that

would be using the facilities.

The *Shoshone-Paiute Tribe* case is also not sufficiently analogous to this case to persuade the Court that the actions are connected. In *Shoshone-Paiute*, the Air Force decided to create a composite wing at an Air Force base and a training range at the same location, and initially decided to evaluate both proposals in a single EIS. 889 F. Supp. 1297, 1301 (D. Idaho 1994), *adopted in* 889 F. Supp. 1292. However, the Air Force was concerned that linking the proposals would cause delay since the training range would likely face public opposition, and the General Counsel told the Air Force that it could delink the two proposals. *Id*. at 1302. The district court concluded that the actions were connected and thus must be evaluated in a single EIS. *Id*. at 1310. First, the court found that the training range was "detailed enough to be analyzed and had moved far beyond the 'contemplation' stage" when the composite wing was being evaluated. *Id*. at 1306. Next, when the Air Force hired an entity to prepare the EIS on the composite wing, it also included a map of the proposed training range and paid $90,000 for an analysis of it. *Id*. at 1306–7. Finally, the training range was removed due to concern about public opposition, not because the proposal was too vague to be part of the EIS on the composite wing. *Id*.

Here, the Record does not support a finding that the Navy had decided at the time it announced the Relocation EIS that it had also decided to create all of the training facilities proposed in the CJMT Draft EIS. There is no denying that the Defendants had a goal of issuing a Record of Decision by 2010 and expressed concern that it would not be met if every MAGTF and Title 10 training facility needed to be assessed in the Relocation EIS. (*See, e.g.*, Sept. 9, 2008 email, GUAMREL00019240 (expressing concerns about falling behind schedule).) However, the reasons for evaluating the

advanced training ranges and areas on Tinian and Pagan in a separate EIS were to account for (1) any realignment of other forces to or out of the Pacific Command Area of Responsibility, and (2) all of the U.S. and allied forces expected to need training on Tinian and Pagan. These reasons do not evidence an intent to improperly segment the Relocation EIS to avoid analyzing all anticipated impacts or to avoid falling behind schedule. Instead, they evidence a rational decision based on defense policy concerns that go beyond the immediate needs of the relocating Marines. Moreover, unlike the Air Force training facility at issue in the *Shoshone-Paiute* case, the RTAs on Tinian and Pagan were not designed just to serve the Marines based on Guam; they were designed to serve all branches of the U.S. forces and their counterparts in allied nations. Accordingly, the *Shoshone-Paiute* case does not persuade the Court that the Relocation and CJMT actions are connected.

Finally, within the claim that the relocation and CJMT actions are connected, the parties dispute whether the Secretary of the Navy acted arbitrarily and capriciously in deciding which capabilities on Okinawa would be replicated on Guam and Tinian in the Relocation EIS. The Court has reviewed the Record evidence submitted by the parties, and concludes that the Secretary acted reasonably.

In particular, Plaintiffs contend that the Marines thought they would lose training that "currently exists in Okinawa" (2009 USMC Briefing to ASECNAV, GUAMREL00020515), and point to the exclusion of mortar and artillery ranges from the Relocation EIS, which were included in the Marines' proposals and Pacific Command's list of training requirements, as proof that the Secretary acted arbitrarily and capriciously. (*See* Sept. 14, 2006 Mem., GUAMREL00017612–25; Feb. 26, 2007 PACOM Memo, GUAMREL00020002–9.) However, the Record also indicates that a

later evaluation of the relocating Marine Corps' requirements defined their immediate training needs as weapons "organic" to the units, and concluded that the weapons organic involved direct fire weapons only, thereby excluding mortar and artillery, both of which are indirect fire weapons. (Aug. 16, 2008 email by JGPO, GUAMREL00017609–10.)

To conclude that the Secretary acted arbitrarily with regard to the mortar and artillery ranges, based on this Record, the Court would have to second-guess a military judgment as to which weapons were organic to the relocating forces and which were not. This is not the role of a court in a NEPA case. Rather, the Court must assess the Record and determine whether rational reasons were given for the choices made. And a rational reason was given: the weapons organic to the relocating units did not include indirect fire weapons, and therefore training facilities for those weapons would not be proposed in the Relocation EIS.

Moreover, as noted elsewhere, the Secretary did not want to evaluate the creation of full MAGTF-capability training ranges in the Relocation EIS because the Department of Defense needed to do a holistic examination of deficiencies and evaluate the needs of all U.S. and allied forces that would train at those facilities. Thus, upon concluding that the mortar and artillery and other indirect fire weapons ranges were not organic to the relocating Marines, it was reasonable to defer consideration of new training ranges for those and other capabilities to the Quadrennial Defense Review.

Accordingly, the Court grants Defendants' motion for summary judgment as to the connected actions claim, and denies Plaintiffs' motion for summary judgment on the claim.

### B.  Cumulative Actions and Cumulative Impacts

Plaintiffs contend that the Relocation EIS and the range and training areas proposed in the CJMT Draft EIS are (1) cumulative actions and (2) have cumulative impacts.  (Mem. in Supp. 42–45.) Defendants maintain this is not the case, but that, if the Court finds otherwise, they will assess the cumulative impacts in the CJMT EIS, which is currently being revised.  (Defs. Mot. 32–37.)

Cumulative actions are those that, "when viewed with other proposed actions have cumulatively significant impacts."  40 C.F.R. § 1508.25(a)(2).  "Cumulative impact" means the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  These impacts "can result from individually minor but collectively significant actions taking place over a period of time."  *Id*.  A plaintiff attempting to demonstrate that an agency failed to analyze all cumulative impacts does not face an "onerous" burden and therefore "need not show what cumulative impacts would occur."  *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010). Instead, a plaintiff needs to show "only the potential for cumulative impact."  *Id*.

Having reviewed the Record and the arguments submitted by the parties, the Court finds that Plaintiffs have sufficiently satisfied their burden to demonstrate the potential for cumulative impacts resulting from the addition of the proposed training facilities on Tinian and Pagan to the relocation of Marines to Guam.  However, because Defendants failed to discuss, and therefore to analyze, in the Final EIS and SEIS potential cumulative impacts from the relocation of Marines and the proposed RTAs on Tinian and Pagan, the Court cannot, at this time, determine whether there are any

"cumulatively significant impacts" and therefore also cannot determine whether the actions are "cumulative actions." *See Klamath-Siskiyou Wildlands Ctr. v. Bur. of Land Mgmt.*, 387 F.3d 989, 1000 (9th Cir. 2004) (finding that because the potential cumulative impacts had not been analyzed, "we simply do not know enough about the cumulative impacts to determine whether they will be significant or whether there are substantial questions as to their significance" and therefore cannot determine if the proposals are cumulative actions).

With respect to the cumulative impacts analysis, the Court first finds that the proposal for range and training areas in the CJMT Draft EIS is a "reasonably foreseeable action" within the meaning of NEPA. In this context, a formally "proposed action" qualifies as a "reasonably foreseeable action" under Ninth Circuit precedent. *Ctr. for Envtl. Law and Pol'y v. U.S. Bur. of Reclamation*, 655 F.3d 1000, 1010 (9th Cir. 2011) (quoting *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 980 (9th Cir. 2006)). There is no question that the CJMT Draft EIS is a "proposed action" because the Navy issued the formal Notice of Intent to prepare the CJMT EIS on March 14, 2013, and therefore the Draft EIS is a reasonably foreseeable action. (Mar. 14, 2013 NOI, GUAMREL000222082.)

Defendants repeatedly stated during the hearing that the CJMT Draft EIS was "withdrawn," but that does not alter the fact that the proposals in the draft are reasonably foreseeable. The CJMT is undergoing revision, and no representations were made to the Court that the revisions excluded the creation of facilities and areas for joint service training on Tinian and Pagan. Thus, the Court lacks any evidence to demonstrate that the proposed RTAs have been abandoned and therefore are not reasonably foreseeable.

Next, the Record demonstrates that there is, at a minimum, the potential for cumulative impacts from the combined effect of the relocated Marines with the larger training ranges proposed for Tinian and Pagan. Defendants stated in the 2010 Record of Decision that the Relocation Final EIS "addressed proposed actions involving the Marine Corps, the Navy and the Army," and given their "temporal and geographic proximity, these cumulative actions were addressed in the same FEIS in order to best assess their potentially cumulative significant impacts." (2010 ROD, GUAMREL00108291.) In other words, the creation of a base on Guam and proposed training ranges on Tinian and Guam, together, had cumulative impacts. It is impossible to reconcile this statement with Defendants' current position that the rebasing of Marines, creation of an individual combat skills training range on Guam, and the creation of *larger* training ranges on Tinian and Pagan cannot have cumulative impacts.

Defendants also repeatedly stated during the hearing that there were no cumulative impacts because the relocation efforts and CJMT proposals never lost their independent utility. The Court agrees that these two large-scale actions never lost their independent utility. But that standard does not control whether there are cumulative impacts, and fails entirely to acknowledge that actions found not to be connected have nonetheless been found to have cumulative impacts. *See, e.g.*, *Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002) (finding timber sale and proposed road density amendments were not connected but may have cumulative impacts).

Despite finding that Defendants failed to evaluate the cumulative impacts that may result from the combination of the relocation efforts and proposed range and training areas on Tinian and Pagan, the Court also finds that Defendants have committed to doing the required cumulative impact analysis within the CJMT EIS as it is revised. The Notice of Intent to prepare the CJMT EIS states that the

Navy will "include an evaluation of direct and indirect impacts and will account for cumulative impacts from other relevant past, present and reasonably foreseeable future actions in the Mariana Islands." (Mar. 14, 2013 NOI, GUAMREL222084.) Defendants have thus "impliedly promised to consider the cumulative effects" of the Relocation and CJMT actions. *Ctr. for Envtl. Law and Pol'y*, 655 F.3d at 1010 (finding Notice of Intent stating that it would include an analysis of cumulative impacts "impliedly promised" to consider the effects of the proposed actions together). In addition, Defendants "*expressly* made the same promise" to the Court, stating in their motion for summary judgment that they would address all cumulative impacts of the relocation and CJMT if ordered to do so. *Id.* (emphasis in original).

Based on these representations, the Court finds that, while there may be cumulative impacts from the actions resulting from the relocation of Marines and the CJMT proposal, there is no NEPA violation because Defendants have committed to assessing these impacts in the CJMT EIS. *See id.* (permitting federal agency to assess cumulative impacts in ongoing EIS and therefore finding no NEPA violation); *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 980 (9th Cir. 2006) (same).

### C. Failure to Supplement

Plaintiffs claim that Defendants failed to supplement the Relocation Final EIS after the 2012 Roadmap Adjustments that created "substantial changes" to the proposed action, such as changes to the exact Marine Corps units that would be relocated and the full-range of weapons, and training in the CNMI, that they would need. (Mem. in Supp. 39–42.) Defendants contend that this is a new claim, and Plaintiffs' failure to plead it in the complaint means that they have waived it. (Defs. Opp.

Br. 26–28.)  Plaintiffs defend their failure to supplement claim by explaining that, in the complaint, (1) they cited the regulations that explain when an agency must supplement an EIS; (2) they alleged that the Navy reassessed the training needed after the 2010 Record of Decision was issued; (3) they alleged that the reassessed training was more intense than the training set out in the original ROD; and (4) they challenged the SEIS for failure to consider the impacts of relocation and the live-fire training proposed in the CJMT.  (Pls. Reply Br. 17–18.)

Having reviewed the paragraphs of the complaint that Plaintiffs cite—paragraphs. 54–55, 68–73, 76, 82–84—the Court finds that the failure to supplement claim has been waived.  Although Plaintiffs generally cited the appropriate regulations in the statutory and regulatory background section, those regulations were never cited again in the portion of the complaint discussing what the legal claims were.  The allegations that the Navy determined that the training set out in the 2010 ROD was inadequate but still failed to amend the Relocation EIS are insufficient to put Defendants on notice of the specific claim that they failed to file a supplemental EIS based on that new conclusion.  Instead, the allegations were used to support Plaintiffs' claims that the actions in the Relocation EIS and CJMT EIS were connected or cumulative actions.  No separate claim for failure to supplement based on changes to the configuration of Marines or their MAGTF training needs was made in the complaint.

The Court rejects the assertion that Defendants "seek to impose an impossible burden on Plaintiffs" who could not have known prior to receiving the Administrative Record that the composition of Marine Corps being relocated to Guam had changed.  (*See* Pls. Reply Br. 18 n.3.)  Even if Plaintiffs did not have the information at the start of the litigation, they received it during the course of litigation and could have sought to amend the complaint prior to—and rather than—filing a motion

for summary judgment. At this late and final stage of the litigation, the Court declines to invite Plaintiffs to essentially restart the case and force Defendants to bear the burden of re-litigating whether the Relocation Final EIS and SEIS are sufficient. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (plaintiffs failed to assert NEPA claim in complaint, but briefed it at summary judgment, and the Ninth Circuit stated that "raising such a claim in a summary judgment motion is insufficient to present the claim to the district court").

## V. CONCLUSION

The Court finds that the Department of Defense and the Department of the Navy's decision to limit the training and range areas to those that met the needs of the Marines being relocated from Okinawa to Guam was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The decision was rationally and reasonably based on a consideration of the factors relevant to complying with the diplomatic agreement with Japan while meeting the immediate training needs of the Marines.

The Court further finds that the actions decided on in the Relocation Final EIS and SEIS for the relocation of Marines in Okinawa to Guam, and the range and training areas proposed in the CJMT Draft EIS are not connected actions. The Department of Defense and Department of the Navy took a hard look at the specific needs of the relocating Marines from Okinawa, and reasonably concluded that the more advanced training ranges to be used by all U.S. forces and allied forces stationed in the Pacific Command Area of Responsibility should be evaluated in a separate environmental impact statement.

The Court also finds that the effects of the range and training areas proposed in the CJMT Draft

EIS could create cumulative impacts that must be addressed in conjunction with the environmental effects of the Relocation action. However, the Court finds that Defendants have committed to addressing these impacts during the ongoing CJMT EIS process, and Defendants are ordered to do so.

Based on the foregoing, the Court concludes that Defendants have not violated NEPA or the APA. Therefore, Plaintiffs' motion for summary judgment (ECF No. 80) is DENIED. Defendants' motion for summary judgment (ECF No. 81) is GRANTED. Judgment in favor of Defendants shall enter.

IT IS SO ORDERED.

Dated this 31st day of August, 2018.


RAMONA V. MANGLONA
Chief Judge